Lisa ASCOLESE

v.

SOUTHEASTERN PENNSYLVANIA
TRANSPORTATION
AUTHORITY,

Louis Van De Beek, Individually and
as a Septa Medical Doctor,

Judith Pierce, Individually and as Septa
Chief Administrative Officer,

Richard J. Evans, Individually and as
Septa Deputy Chief of Police,

Ronald Sharpe, Individually and
as Septa Chief of Police.

Civ. A. No. 93–1461.

United States District Court,
E.D. Pennsylvania.

Sept. 28, 1995.

As Corrected Nov. 2, 1995.

Francis J. McGovern, Jr., Merri R. Lane, P.C., Philadelphia, PA, for plaintiff.

Saul H. Krenzel, Saul H. Krenzel & Assoc., Philadelphia, PA, for defendants.

## OPINION

LOUIS H. POLLAK, District Judge.

This action was brought by Lisa Ascolese, who was at the time of the events at issue a police officer for the Southeastern Pennsylvania Transportation Authority (hereinafter "SEPTA"). The defendants include SEPTA itself and various SEPTA employees, sued in their official and individual capacities (Dr. Louis van de Beek, Judith Pierce, Richard J. Evans, and Ronald Sharpe). The defendants have filed a motion for summary judgment, seeking the dismissal, on a variety of grounds, of all of the claims made by plaintiff Lisa Ascolese. For the reasons that follow, this motion will be granted in part and denied in part.

### I. Background

As is customary in considering a motion for summary judgment, the following scenario is a distillation of the record at this stage of the case which resolves all uncertainties of fact in the light most favorable to the nonmoving party, Ms. Ascolese.

The sequence of events giving rise to Ms. Ascolese's complaint began in 1991, when SEPTA decided to initiate a fitness program for its transit police officers. Under this program, the officers were to undergo a physical examination, including both a medical examination and fitness testing. Officers who were not in appropriate physical condition would then be required to undertake an exercise program.

SEPTA held a luncheon to explain the program to female officers, who it anticipated might have more difficulty with meeting fitness standards than would males. The lunch was attended by, among others, Louis van de Beek, a SEPTA medical officer, and Judith Pierce, Chief Administrative Officer for SEPTA. At this lunch, Lisa Ascolese (and other officers) expressed reservations about the fact that the medical tests required for the program would be administered by SEPTA's medical staff, who Ascolese felt were "not professionals" and motivated by the desire "to keep you from reporting an injury if you are injured."[1] Because the women at the meeting had not had bad experiences with him, Dr. van de Beek offered to conduct the medical examinations of the women officers himself.[2]

A substantial part of the plaintiff's claims in this suit stem from her allegations regarding Dr. van de Beek's examination of her, which occurred on October 4, 1991. He opened the examination by requesting that she call him "Louie," and asking that she wear her gown open in the front; she chose instead to wear her gown open at the back, under which she wore her bra and a pair of boxer shorts. Van de Beek also told Ascolese that she would be tested for pregnancy; Ascolese objected to such a test as an invasion of her privacy. In fact, a technician had already obtained a urine sample from Ascolese before the examination for use in this pregnancy test. It is not clear, however, whether a pregnancy test was actually conducted.[3]

In the course of the examination, van de Beek examined Ascolese's hips and spinal column by having her bend over an examining table and move her hips from left to right. Ascolese asserts that during this process, he stood behind her, with his body in contact with her from his waist to his knees, and touched her hips and spine with his hands. According to Ascolese, van de Beek also complimented her on a tattoo on her shoulder during this process. Later in the examination, he told her that he was going to examine her liver and spleen, then tore her paper gown in the front to do so, placing his hand under her boxer shorts; during this examination, his hand allegedly touched her pubic hairline.

Ascolese did not immediately bring the alleged events at this examination to SEPTA's attention. Several days afterwards, however, a SEPTA official, Kathy Blankley, called her to ask some questions about her examination. On that occasion, Ascolese expressed her intention to file a complaint. Ascolese was thereafter called to Judith Pierce's office to discuss the matter. According to Ascolese, Pierce attempted to intimidate her into not pursuing the matter; defended van de Beek's conduct; and stated that it was important to protect van de Beek's reputation. Pierce also supplied Ascolese with a copy of SEPTA's sexual harassment policy and with the card of a representative of SEPTA's Office of Civil Rights, the office charged with enforcing that policy. Shortly thereafter, on October 13, Ascolese was subjected to what purported to be a random drug test, which Ascolese claims was in fact scheduled solely to intimidate her.

The next major chapter in Ascolese's story did not occur until March 15, 1992, when she submitted a memorandum to SEPTA stating that she was pregnant and requesting that SEPTA provide her with a light-duty assignment. Richard Evans, SEPTA's Deputy Chief of Police, responded by requesting through another officer that Ascolese submit a doctor's note containing specific information on her medical condition and listing what limitations should be placed on her activities. Ascolese asserts that the request for specific information on her condition and limitations

---

1. The words are those of Dr. van de Beek, paraphrasing the concerns expressed at the meeting. According to Dr. van de Beek, "This was said in a very sharp tone. I'd go so far as to say a very nasty tone." Plaintiff's Exhibits 22, 23.

2. Deposition of Louis van de Beek, Plaintiff's Exhibit 2.

3. This may be because SEPTA, as a result of its investigation of the fitness testing program, later determined not to conduct such tests "without the express consent of the patients involved," and eliminated all records of the pregnancy test from the files of its women officers. *See* Memorandum from Judith Pierce to the File, October 28, 1991, Plaintiff's Exhibit 12.

did not reach her. On March 20, Ascolese obtained a doctor's note which stated merely that she was twelve weeks pregnant and under a doctor's care; she was then told that she needed to submit a more specific note. After having heard that she had complained that her request had been denied, Evans arranged a meeting with Ascolese on March 26 to discuss her request. Ascolese asserts that Evans made a number of remarks at this meeting that expressed a lack of sympathy for her situation, including that she "would look humorous eight months pregnant in uniform," that she should not ask for special treatment, that he did not know why she had to eat every three hours, and that she was a "troublemaker".[4] Ascolese responded by filing a grievance on March 27, after which she obtained a second doctor's note on April 3, which stated that she "should be given a desk job for the remainder of her pregnancy." SEPTA asserts that it did not receive this note until April 8. Because the second note failed to state what limitations there were on Ascolese's ability to work, Evans's office called plaintiff's doctor directly. On April 13, the doctor wrote a letter stating that Ascolese could work at a desk job with no further limitations; the letter was mailed on April 16, and Evans received it on April 20. In the interim, SEPTA arranged a medical examination for Ascolese at SEPTA's medical office, scheduling it for April 20. The examination itself apparently did not occur; instead, the examining physician endorsed Ascolese's request on the basis of the new note from Ascolese's physician. Ascolese's request for light duty was finally approved on April 21.

Ascolese brings a wide range of claims, appearing in eight counts, based upon the foregoing sequence of events. For purposes of their consideration here, these claims will be grouped into four general classes: (1) claims based on Title VII (42 U.S.C. 2000e *et seq.*), including sexual harassment, retaliation, and disparate treatment claims; (2) claims under 42 U.S.C. § 1983; (3) claims under 42 U.S.C. § 1985(3); and (4) state-law tort claims. Ascolese names as defendants SEPTA, Dr. Louis van de Beek, Judith Pierce, Richard Evans, and Ronald Sharpe, SEPTA's Chief of Police.

## II. Title VII Claims

### A. Liability of Individual Defendants to Suit under Title VII

 This case presents an unsettled question of federal law—namely, whether a Title VII plaintiff can sue, in addition to the allegedly discriminatory employer, an employee of the employer who is alleged to have participated, in his or her individual capacity, in the alleged discrimination. The Third Circuit has not yet considered this question, and, as a recent opinion by my colleague Judge Joyner demonstrates, judges within the Eastern District of Pennsylvania are divided in their approach to this question. *See Caplan v. Fellheimer Eichen Braverman & Kaskey,* 882 F.Supp. 1529, 1531 (E.D.Pa. 1995). Three of the courts of appeals that have considered the question have concluded that actions against employees are not permitted.[5] I agree with that conclusion, but on

---

**4.** Ascolese's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment states that when Ascolese told Evans that she needed to know whether she would be assigned to light duty so that she could decide whether to purchase a new uniform (to accommodate the physical changes associated with pregnancy), Evans "suggested that she borrow a pair of pants from a male officer." Because this assertion does not appear in the complaint or in any of the exhibits presented by Ascolese, however, the court will not consider it for purposes of this motion.

**5.** *See Grant v. Lone Star Co.,* 21 F.3d 649, 652 (5th Cir.1994); *Miller v. Maxwell's Intern. Inc.,*

991 F.2d 583, 587–88 (9th Cir.1993); *Busby v. City of Orlando,* 931 F.2d 764, 772 (11th Cir. 1991). The Tenth Circuit came to the same conclusion in an unpublished opinion upholding an unpublished district court opinion. *See Sims v. KCA Inc.* 28 F.3d 113, 1994 WL 266744 (10th Cir.1994) (table; reprinted in full in Westlaw). (In the Tenth Circuit, citation of unpublished opinions is "unfavored," but "unpublished opinions may be cited if the opinion has persuasive value on a material issue". General Order of November 29, 1993, suspending 10th Circuit Rule 36.3 until December 31, 1995, as cited in Westlaw.) A later panel of the Tenth Circuit endorsed the opposite view strongly in dicta, however, *see Ball v. Renner,* 54 F.3d 664, 666–

somewhat more limited grounds than those stated by certain of the other courts that have considered the question. The underlying question arises because of an apparent tension between two statutory provisions each of which seems to have a plausible claim to applicability; in such a case, a court's obligation is to seek an interpretation that accommodates the provisions in a manner that is faithful to the over-all Congressional design and does a minimum of violence—hopefully, none at all—to the legislative text.

The first of the statutory provisions at issue is Title VII's definition of an "employer." Title VII's bar on discrimination in the workplace applies principally to "employers," see 42 U.S.C. § 2000e–2(a); the statute defines an "employer" to be "[any] person engaged in an industry affecting commerce who has fifteen or more employees ... *and any agent of such a person,*" § 2000e(b) (emphasis supplied). Unfortunately, Title VII's legislative history sheds little light on the meaning of the "and any agent" language. However, a literal reading of this provision would appear to permit an action not only against an employer (whether corporate or individual), but also against any entity or person acting for the employer in the course of conduct allegedly violative of Title VII. A person cast in such a role would most likely be an employee—probably not just any employee, but one operating at a significant policy-making level. The court will refer to these employees as "employee-agents."[6] Some courts have indeed found that an employee-agent can be sued under Title VII as the "agent" of a Title VII "employer". *See, e.g., Jones v. Continental Corp.,* 789 F.2d 1225, 1231 (6th Cir.1986).

Other courts have found, by contrast, that the exclusion of businesses with fewer than fifteen employees from the definition of an "employer" is evidence of a Congressional intent to protect those with limited financial resources, including individuals, from being the targets of Title VII enforcement. *See, e.g., Miller v. Maxwell's International, Inc.,* 991 F.2d 583, 587 (9th Cir.1993) (asserting, although without stating the basis for this assertion, that the fifteen-employee minimum was included in Title VII because "Congress did not want to burden small entities with the costs associated with litigating discrimination claims"); *see also E.E.O.C. v. AIC Security Investigations, Ltd.,* 55 F.3d 1276, 1281 (7th Cir.1995) (making a similar argument under the Americans with Disabilities Act). In fact, however, it has been argued that comments made on the floor of the Senate when Title VII was enacted suggest that this limitation had two purposes: first, it was an effort by Congress to avoid legislating beyond the constitutional limits of the Commerce Clause;[7] and second, it was intended to avoid the application of the Act to family businesses, or businesses of a similar

---

668 (10th Cir.1995). The latter opinion did not cite *Sims,* very likely because that unpublished opinion had not been drawn to its attention.

Two circuit courts have also found that statutes with very similar definitions of an "employer," the Americans with Disabilities Act and the Age Discrimination in Employment Act, do not permit actions against individual employees. They made these findings on grounds that would seem directly transferable to Title VII. *See E.E.O.C. v. AIC Security Investigations, Ltd.,* 55 F.3d 1276, 1281 (7th Cir.1995) (Americans with Disabilities Act); *Birkbeck v. Marvel Lighting Corp.,* 30 F.3d 507, 510 (4th Cir., 1994) (Age Discrimination in Employment Act).

The only circuit court to find that Title VII does permit individuals to be held liable is the Sixth Circuit, in a decision made before the enactment of the Civil Rights Act of 1991. *See Jones v. Continental Corp.,* 789 F.2d 1225, 1231 (6th Cir.1986). A number of district courts have come to the same conclusion, however. *See, e.g. Schallehn v. Central Trust and Sav. Bank,* 877 F.Supp. 1315, 1333 n. 15 (N.D.Iowa 1995). Academic commentary has also been largely in favor of individual liability. *See, e.g.* Janice R. Franke, *Does Title VII Contemplate Individual Liability for Employee/Agent Defendants?,* 12 *Hofstra Lab. L.J.* 39 (1994); Scott B. Goldberg, *Discrimination by Managers and Supervisors: Recognizing Agent Liability under Title VII,* 143 *U.Penn.L.Rev.* 571 (1994); Phillip K. Lambertson, *Personal Liability for Violations of Title VII: Thirty Years of Indecision,* 46 *Baylor L.Rev.* 419 (1994).

**6.** Such a person need not necessarily be an employee, however: a lawyer retained to handle certain aspects of employee relations could also, for instance, fit this description. And, of course, a range of types of entities that were not persons could also be agents of a Title VII "employer".

**7.** *See* Lambertson, *supra,* at 427.

character[8] (perhaps because Congress felt that it would be inappropriate to hold such businesses to federal standards, or felt that policing observance of federal standards in thousands of very small enterprises would be a difficult and relatively unproductive endeavor). The logic of the latter rationales would not appear to preclude treating individuals as "agents" under section 2000e(b): if Congress had found that firms of a certain size (more than fourteen employees) should be required to conform to Title VII standards because they are unlikely to present the characteristics that warrant the exemption of smaller firms from coverage by the statutory mandates, then there would seem to be no compelling reason why the policy-making individuals responsible for a covered firm's non-conformity with federal standards should be insulated from liability. If a case can be made for excluding a covered firm's policy-making employees from "agent" liability, that case must be built upon the wording or evident design of a second, complementary statutory provision, 42 U.S.C. § 1981a.

Section 1981a was enacted as part of the Civil Rights Act of 1991. Subsection (a) of section 1981a enlarged a successful Title VII plaintiff's entitlement—which theretofore was limited to equitable remedies (including,

in an appropriate case, money awards in the form of back pay and/or front pay)—to authorize awards of compensatory and punitive damages in instances of intentional discrimination.[9] Subsection (a) specifies that such damages are "as allowed in subsection (b) of this section." Subsection (b) then sets forth a sliding scale of maximum awards of those damages, ranging from $50,000 "in the case of a respondent who has more than 14 and fewer than 101 employees" to $300,000 for respondents with more than 500 employees.[10] The point to be noted here is that the scenario subsection (b) describes, in specifying the sliding scale of maximum awards, is one in which the respondent is an *employer*—i.e., a "respondent who has ... employees." Nothing is said in subsection (b) or elsewhere with respect to the liability of respondents who do not have employees, such as employee-agents, or with respect to the limits of that liability. Is this lacuna to be understood as meaning that damage awards may be rendered against an employee-agent and that such awards are not subject to any dollar cap? Or is it not more probable that Congress did not contemplate that employee-agents would be called on to respond in damages? In my view, the latter is the better reading of Congress's delphic silence.[11] Thus, the Title VII claims against

---

8. *See id.* at 427–28 (citing the remarks of Senator Hubert Humphrey on the Senate floor); Goldberg, *supra*, at 577 n. 33 (citing legislative history from the statute's amendment in 1972).

9. "In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e–5) against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) prohibited under section 703, 704 or 717 of the Act (42 U.S.C. 2000e–2 or 2000e–3) and provided that the complaining party cannot recover under section 1981 of this title, the complaining party may recover compensatory and punitive damages as allowed in subsection (b) of this section, in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent." 42 U.S.C. § 1981a(a)(1).

10. "The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining

party—(A) in the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $50,000; (B) in the case of a respondent who has more than 100 and fewer than 201 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $100,000; and (C) in the case of a respondent who has more than 200 and fewer than 501 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $200,000; and (D) in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000." 42 U.S.C. § 1981a(b)(3).

11. This court declines, however, to do as some courts have done, and read § 2000e(b)'s "and any agent" language as merely ensuring the *respondeat superior* liability of the employer. *See, e.g., Miller,* 991 F.2d at 587; *see also AIC Security Investigations,* 55 F.3d at 1281 (construing similar language in the Americans with Disabilities Act). The "and any agent" language is certainly relevant to an employer's *respondeat superior* liability. In *Meritor Savings Bank v. Vinson,*

individual defendants van de Beek, Pierce, Sharpe, and Evans must be dismissed.

**B.** *Effect of the Nonretroactivity of Title VII's Compensatory and Punitive Damages Provisions*

■ In *Landgraf v. USA Film Products,* 114 S.Ct. 1483, 1505–08 (1994), the Supreme Court found that the provisions of 42 U.S.C. § 1981a which permit awards of compensatory and punitive damages for acts of intentional discrimination were not retroactive. Thus, Ascolese cannot base a claim for compensatory or punitive damages on events occurring before the date of enactment of the Civil Rights Act of 1991, which was November 21, 1991. An allegation that the harassment amounted to a continuing course of conduct beginning before the statute was enacted and continuing thereafter does not suffice to overcome the nonretroactivity rule. *See Adams v. Pinole Point Steel Co.,* No. C–92–1962 MHP, 1995 WL 73088 at \*6, 1995 U.S.Dist. LEXIS 2036 at \*19 (N.D.Cal. Feb. 10, 1995) (finding that recovery was barred for acts occurring before the enactment of the Civil Rights Act of 1991, even if the pre-enactment acts were part of the same course of conduct as some post-enactment acts). Thus, Ascolese cannot recover compensatory or punitive damages for Dr. van de Beek's alleged conduct at his examination of As-

colese, which occurred on October 4, 1991; for the alleged conduct of defendant Pierce at her meeting with Ascolese shortly thereafter; or for the drug test administered to Ascolese on October 13, 1991.[12] Because Ascolese does not seek any other remedy under Title VII than compensatory or punitive damages based upon these events, her Title VII claims based upon these events must be dismissed. Accordingly, the only remaining factual allegations that could give rise to Title VII liability concern Ascolese's efforts, which began on March 15, 1992, to secure light duty during her pregnancy.

**C.** *Sexual Harassment Claims.*

■ We now turn to the question of whether Ascolese can sustain a claim under Title VII for the events described in her complaint that occurred after November 21, 1991, all of which revolve around her difficulties in securing light duty during her pregnancy. SEPTA's light-duty policy appears to have been in some disorder at the time of Ascolese's application for light duty. Officially, SEPTA did not permit any light-duty assignments for disabilities not occurring in the line of duty. In practice, however, SEPTA seems to have sometimes granted light-duty assignments to officers disabled other

477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court cited this language in support of its conclusion that "Congress wanted courts to look to agency principles for guidance" as to employers' *respondeat superior* liability. *Id.* at 72, 106 S.Ct. at 2408. The Supreme Court did not, however, state that this language's only effect was to ensure the *respondeat superior* liability of the employer. Rather, it cited the language as helpful in reaching its conclusion that agency principles applied: "While such common-law principles may not be transferable in all their particulars to Title VII, Congress's decision to define "employer" to include any "agent" of an employer, 42 U.S.C. § 2000e(b), surely evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible." *Id.* Common-law principles of agency might well apply in any case, so that reading the "and any agent" language as only emphasizing their applicability would leave the language with little meaning. *See Ball v. Renner,* 54 F.3d 664, 667 (10th Cir. 1995); *Schallehn v. Central Trust and Sav. Bank,* 877 F.Supp. 1315, 1333 n. 15 (N.D.Iowa 1995).

The question of whether the "and any agent" language permits actions against any persons or entities other than individual employees is a difficult one, and, because it is not presented by the present case, this court will not attempt to answer it. There is at least one case, decided before the enactment of the Civil Rights Act of 1991, which held the "and any agent" language to permit a suit against an "agent" that was not an individual employee. *See Owens v. Rush,* 636 F.2d 283, 286–87 (10th Cir.1980) (finding that a sheriff's department with fewer than fifteen employees was an agent of a county that qualified as an "employer," and therefore was itself subject to suit under Title VII as an "employer").

12. Ascolese's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment can also be construed to make Title VII claims based upon some actions of SEPTA that were not alleged in the original complaint, including the luncheon to introduce the fitness program and a run for female employees that SEPTA conducted for the same purpose. Because these events occurred before November 21, 1991, Ascolese may not maintain a Title VII based upon them.

than in the line of duty. In one instance, SEPTA seems to have granted a verbal request for light duty in such a case, that of an officer who had a "debilitating illness and requested we find some administrative function for him so that he didn't burn up all his sick time so he could remain active." (*See* Deposition of Richard Evans, Plaintiff's Exhibit No. 42, pp. 95–96) The fact that the request was verbal suggests that SEPTA may have had little or no medical evidence as to, for instance, necessary limitations on the requestor's activities. In other cases, the standard of medical evidence required by SEPTA is unclear.[13]

Construing the facts in the light most favorable to the plaintiff, it appears at least possible that Ascolese's request for light duty was held to an unusually high standard by her superiors. Ascolese was repeatedly required to secure more medical documentation. Most notably, when Ascolese submitted a note from her doctor (apparently on April 8) stating that she should be given a desk job for the remainder of her pregnancy, SEPTA took what a jury might regard as the curious step of leaving her on what was apparently a fairly strenuous active-duty assignment pending the arrival of information that would permit it to give her a desk job tailored to her limitations. The result was a twelve-day delay which a jury might well conclude was unnecessary.[14] Ascolese also asserts that she was caused distress by Deputy Police Chief Evans's allegedly humiliating treatment of her at their meeting to discuss her light duty request. This alleged treatment included comments skeptical of whether pregnancy qualifies as a disability. Evans's comments could be interpreted to suggest that it was this skepticism that later

made Evans reluctant to grant Ascolese's light duty requests.

Title VII states that "it shall be an unlawful employment practice for any employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *See* 42 U.S.C. § 2000e–2(a). Title VII expressly defines discrimination "because of sex" to include discrimination "because or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). The Supreme Court first recognized that Title VII created a cause of action for hostile environment sexual harassment in *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). In that case, the Court stated that "[f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* at 67, 106 S.Ct. at 2405 (internal quotation omitted).

The principal case interpreting *Meritor* in the Third Circuit is *Andrews v. City of Philadelphia*, 895 F.2d 1469 (3d Cir.1990), which lists five factors that a plaintiff must show in order to establish hostile environment sexual harassment. These factors are: (1) that the employee suffered intentional discrimination because of his or her sex; (2) that the discrimination was "pervasive and regular"; (3) that the discrimination detrimentally affected the plaintiff ("subjective" harm); (4) that the discrimination would detrimentally affect a reasonable person of the same sex in that position ("objective" harm); and (5) the existence of respondeat superior liability. *Id.* at 1482.

13. SEPTA asserts that a written medical opinion was required to grant light duty to those disabled off-duty in three cases cited by the plaintiff, those of Richard Flynn, Antonio Miller, and Herman Harris. *See* Defendants' Motion for Summary Judgment at 27–29. This claim is, however, not entirely supported by the evidence cited by counsel. Nor is it clear that the medical opinion required in these cases was as detailed as that required of Ascolese.

14. SEPTA argues that the problem was entirely caused by Ascolese, who failed to obtain the

proper type of medical notes and who delayed in securing notes from her doctor until her regularly scheduled medical appointments. Certainly, there are plausible theories other than that SEPTA's superiors deliberately delayed approving her light-duty application, including that Ascolese did not pursue her light-duty request sufficiently vigorously, that SEPTA and Ascolese miscommunicated, that SEPTA committed an internal bureaucratic error, or that some combination of the foregoing occurred. Determining which of these scenarios may have persuasive evidentiary support is peculiarly a jury function.

After the Supreme Court's decision in *Harris v. Forklift Systems,* —— U.S. ——, ——, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993), it appears that the second, third and fourth factors in *Andrews,* the pervasiveness of the conduct and the existence of subjective and objective harm, should be analyzed together to determine whether a work environment is "hostile" or "abusive". In *Harris,* the Supreme Court stated that the hostility or abusiveness of an environment must be evaluated by considering all of the relevant circumstances, which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." 114 S.Ct. at 371. *See also Vance v. Southern Bell Tel. and Tel. Co.,* 863 F.2d 1503, 1511 (11th Cir. 1989) (stating that "the law requires that the finder of fact examine not only the frequency of the incidents, but the gravity of the incidents as well").

Although the events described by Ascolese in her efforts to obtain light duty, if true, amount to significant mistreatment, they do not suffice to show hostile environment sexual harassment under the *Harris* standard. Ascolese bases her claim on two aspects of her treatment by SEPTA, her interview with Evans and the delay in her receipt of light duty. To begin with the former event, Evans's conduct at his interview with her, although offensive and perhaps humiliating, was not as severe or as threatening as the conduct at issue in *Harris.* His alleged remarks certainly demonstrate a lack of sympathy for Ascolese or for pregnant women generally; they included statements that she wanted "special treatment," was being "overly sensitive," was a "troublemaker," that it was unclear why she needed to eat every three hours, and that her pregnancy resembled a headache. *See* Complaint, Count Four, ¶¶ 39–42. They fall short, however, of

the level of hostility and physical threat of the conduct at issue in *Harris,* which included a manager suggesting to the plaintiff that she should be replaced by a man, stating that they should "go to the Holiday Inn to negotiate Harris's raise" and requesting that she retrieve keys from his front pants pocket. *See Harris,* 114 S.Ct. at 369. The only remark that approaches the level of severity and threat at issue in *Harris* is Evans's alleged statement that Ascolese "would look humorous eight months pregnant in uniform," which could be read as a threat to deny her light duty throughout her pregnancy.

Apart from her interview with Evans, the other event cited by Ascolese in support of her sexual harassment claim is the delay of somewhat over five weeks between her initial request for light duty on March 15, 1992 and the date that she finally received light duty, April 21. Not all of this period can reasonably be attributed to harassment of Ascolese, as any bureaucratic entity will necessarily take some time to carry out even a routine reassignment. However, Evans's alleged conduct in his conversation with Ascolese could serve as the basis for a finding that at least some of the delay was motivated by animus towards Ascolese based upon her sex.[15] The period during which SEPTA's delay in granting Ascolese light duty seems least justified—the period after April 8, when she submitted a doctor's note stating that she should be given a desk job—lasted some twelve days. SEPTA presents the testimony of a medical expert who asserts that AMA guidelines permit women to continue even "strenuous" work until the twentieth week of pregnancy, and that his review of Ascolese's job description suggests that her working through her seventeenth week of pregnancy posed "no additional risk ... to Ascolese, her co-workers, or the pregnancy." (Defendant's Exhibit P)[16] Of course, neither Ascolese nor

15. SEPTA argues that Evans did not make decisions as to who was entitled to light duty. Evans's own testimony, however, indicates that he was very familiar with the handling of light duty requests, *see* Deposition of Deputy Chief Richard Evans, Plaintiff's Exhibit 44, and Evans seems to have played a role in processing Ascolese's own request for light duty.

16. Although Ascolese argues generally that the work of a SEPTA police officer is especially demanding, as it involves climbing stairs, working in tunnels, and the like, she does not relate these claims to the AMA's definition of "strenuous" work in a way that would suggest that Ascolese's work was outside that definition. Nor does she state that her doctor had some special basis for

any other "reasonable woman" would necessarily be familiar with the AMA's guidelines; thus, Ascolese could reasonably have believed that the delay put her and her fetus at some risk, and this belief—reinforced by her physician's note—could have reasonably had some adverse effect on Ascolese or on her work performance.

Taken together, Ascolese's encounter with Evans and her difficulties in obtaining light duty do not, however, suffice to satisfy the standard for a "hostile" or "abusive" environment set forth in *Harris* and in the second and third factors of the *Andrews* analysis. As to what *Harris* calls "frequency," and *Andrews* "pervasiveness and regularity," the single conversation with Evans and a delay of some weeks in receiving light duty cannot be said to amount to "frequent" or "pervasive" harassment. As to the elements that *Harris* calls "severity," "physical threat," "humiliation," and "unreasonable interference with an employee's work performance," and which *Andrews* terms simply a detrimental effect on an employee's work performance, Evans's alleged comments and the alleged delay in Ascolese's receipt of light duty could perhaps have led Ascolese to fear reasonably for her health and that of her fetus, and could hence have been to some extent physically threatening and a source of interference with her job performance. However, with the exception of Ascolese's encounter with Evans, her other difficulties were entirely of a bureaucratic character. While perhaps Kafkaesque, these difficulties did not involve the element of immediate personal threat that ordinarily contributes the most to the "hostility" or "abusiveness" of a work environment, and that was, for instance, at issue in *Harris*. This is not to say that misfeasances of a bureaucratic nature can never establish the existence of work difficulties sufficiently pointed, and gender-defined, so as to satisfy the *Harris* standard, but rather that such difficulties must be intense, comprehensive and sustained. The conduct alleged by Ascolese, while certainly unacceptable, seems better characterized as episodic indifference than as

believing that she should receive light duty im-

a pattern of "abusiveness" and "hostility." Therefore, it is not actionable under *Harris*.

D. *Title VII Retaliation Claim*

Ascolese also makes a claim of retaliation under 42 U.S.C. § 2000e-3, which provides that it shall be unlawful for an employer "to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title." This provision protects employees who complain of alleged discrimination from being retaliated against by their employer.

■■■ Under Third Circuit case law, in order to establish a *prima facie* case of retaliation, Ascolese must demonstrate that (1) she engaged in a statutorily protected activity, (2) she suffered an adverse employment action, and (3) a causal link exists between the protected activity and the employment action. *See Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3rd Cir.1989), *cert. denied*, 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990). Ascolese appears to have demonstrated all three elements here. She reported her alleged harassment by van de Beek to Pierce, satisfying the first requirement. She encountered a delay in securing light duty from SEPTA, satisfying the second. As to the third element, Evans was presumably aware of Ascolese's complaints about van de Beek's conduct; indeed, the affidavit sent through Evans to Ascolese by SEPTA's Office of Civil Rights, which summarized Ascolese's complaint, was dated February 27, shortly before Ascolese submitted her first request for light duty on March 15. Moreover, Ascolese's allegation that Evans called her a "troublemaker" could be read to suggest that his treatment of her was influenced by her having filed a complaint. Thus, Ascolese has made out a claim for retaliation sufficient to survive summary judgment.

E. *Title VII Disparate Treatment Claims*

■■ Title VII prohibits an employer from "discriminat[ing] against any individual with

mediately.

respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," *see* 42 U.S.C. § 2000e–2(a). Ascolese charges that the defendants' conduct amounted to prohibited disparate treatment under Title VII, both as to Ascolese's race and as to her gender. Ascolese's claim of racial discrimination focuses on her claim that SEPTA delayed unduly in granting her light duty. Ascolese, who is white, cites as evidence a letter by a union representative which lists six officers recently given light duty and which asserts that five of them were non-white. She also asserts that she was told by a Hispanic fellow employee that the latter was given light duty immediately upon notifying SEPTA of her pregnancy.

The Supreme Court has interpreted Title VII to require that the plaintiff make a *prima facie* case of disparate treatment by a preponderance of the evidence in order to establish a presumption in the plaintiff's favor, which the defendant may then seek to rebut. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). To establish a *prima facie* case in the hiring context, the Court said, a plaintiff must "prove by a preponderance of the evidence that she applied for an available position, for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Id.* Although Ascolese has showed she applied for light duty and that her application was initially denied, she has failed to show that this occurred under circumstances which give rise to an inference of unlawful discrimination. The statistical evidence she cites involves a very small sample, lacks any indication of how the officers she cites were selected for inclusion in that sample, does not state whether all of the officers granted light duty during a particular period are included, and does not indicate the racial distribution in SEPTA's police force. Nor does Ascolese cite any evidence of racial animus towards her or other white employees that would add credibility to her claims. Thus, Ascolese's racial

discrimination claim under Title VII must be dismissed.

■ Ascolese's sex discrimination claim appears to be somewhat better founded. The factual basis for this claim overlaps substantially with Ascolese's sexual harassment claim; but since the applicable legal standards for the two claims are distinct, it is necessary to consider them separately. To begin with Ascolese's claim as to her light duty request, although Ascolese has not demonstrated that SEPTA held men and women to different standards as a matter of policy, she has made a showing that she was held to a higher standard than was at least one other disabled officer—the officer who, according to Evans, had been granted light duty following a verbal request—and that there is sufficient ambiguity as to how SEPTA's policy was applied in practice to suggest that other officers may not have been held to the same high standard.[17] Evans's alleged skepticism about the status of pregnancy as a disability could be interpreted to suggest that Ascolese's sex was a factor in this occurrence. This suffices to establish Ascolese's *prima facie* case under *Burdine.*

Under *Burdine,* SEPTA, confronted with a *prima facie* claim, then has an opportunity to set forth a legitimate, non-discriminatory reason for its actions, which Ascolese may then challenge, *id.* at 255–56, 101 S.Ct. at 1094–95. SEPTA asserts that Ascolese was denied light duty because she failed to submit the necessary medical documentation to support her light duty request. Under *St. Mary's Honor Center v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) this claim would appear to suffice to eliminate the presumption of discrimination which, under *Burdine,* arises once a plaintiff makes out a *prima facie* case of discrimination. *See Hicks,* 113 S.Ct. at 2748. The burden of persuasion is therefore Ascolese's, and she must demonstrate that SEPTA's conduct had a discriminatory motivation.

A jury could reasonably conclude that SEPTA's conduct was so motivated. The standard of medical evidence required by SEPTA was unclear, and perhaps inconsis-

---

**17.** Under 42 U.S.C. § 2000e(k), treating pregnant women differently from "other persons not so affected but similar in their ability or inability to work" is sex discrimination.

tent; Evans allegedly demonstrated some skepticism about the status of pregnancy as a disability; and Ascolese did not receive a change in assignment even after submitting a note from her doctor that stated outright that she should have a desk job. A jury finding Ascolese's allegations to be supported factually might reasonably conclude that SEPTA's explanation is pretextual.

### III. § 1983 Claims

Under 42 U.S.C. § 1983, the federal courts may hear suits against any person who, under color of law, deprives another of rights, privileges and immunities secured by the Constitution and laws of the United States. SEPTA does not deny that it is a "person" for purposes of section 1983, or an entity whose acts are treated as done "under color of law," and, especially as SEPTA has been treated as such in the past, *see, e.g., Davis v. Southeastern Pennsylvania Transportation Authority,* 924 F.2d 51, 53 (3d Cir.1991), the court will not dwell on these questions.

Ascolese's section 1983 claims can be subdivided into (1) claims of race discrimination contravening her right to equal protection, (2) claims of sex discrimination contravening the same right.

### A. Race Discrimination Claims

■ To begin with the first category of section 1983 claims, an allegation of racial discrimination in violation of the Constitution's guarantee of equal protection cannot survive unless the plaintiff establishes that the defendant acted with discriminatory intent. *See Washington v. Davis,* 426 U.S. 229, 241, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976) (finding that a showing of discriminatory purpose is necessary to bring a claim of racial discrimination under the equal protection component of the Due Process Clause of

the Fifth Amendment or under the Equal Protection Clause of the Fourteenth Amendment); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265–66, 97 S.Ct. 555, 563–64, 50 L.Ed.2d 450 (1977) (noting that race need only be one, not the sole, motivating purpose for a challenged action). As already noted in the discussion of her Title VII race discrimination claim, Ascolese has failed to adduce evidence that SEPTA acted with the intent to discriminate on the basis of her race.

### B. Sex Discrimination Claims: Liability of Individual Defendants

■ Ascolese cannot maintain a section 1983 claim for sex discrimination against Sharpe, Evans's supervisor. Sharpe's only relationship to the facts alleged by Ascolese is his role as Evans's supervisor. Ascolese does not allege any specific facts indicating that Sharpe influenced the conduct of van de Beek or of Evans, or the handling of Ascolese's light duty claim.

■ There is marginally more evidence against Pierce than against Sharpe, but still not enough to survive summary judgment. Pierce maintains that she had no role in the consideration of individual light duty requests. *See* Defendant's Reply Memorandum, Exhibit B, at 75. Ascolese, in response, points to deposition testimony by Evans that Ascolese asserts can be read to indicate that Pierce had a role in considering and denying Ascolese's light duty request.[18] The testimony in question is vague, and cited out of context; on close reading, it indicates at most that Pierce and her subordinates *collectively* played a role in considering Ascolese's light duty request, not that Pierce herself did.[19] This does not contradict Pierce's assertion

---

**18.** The testimony in question is: "Q. You got that letter from the doctor? A. There were a number of different letters that didn't really address that concern. It was at that point that the process was with Mrs. Pierce and Human Resources and those other folks that I mentioned in the meeting. That's where decisions were made not to address her light duty status. However, when she was determined to be disqualified she used sick time until the negotiation took place." Plaintiff's Exhibit 25. The plaintiff provides no more than a single page of the deposition testi-

mony; the other material on the page appears to consist of questions and answers about Evans's handling of Ascolese's light duty request, and does not help to clarify the meaning of this statement.

**19.** The testimony states that "the process was with Mrs. Pierce and Human Resources and those other folks," and does not assert specifically that Pierce had any personal role in the decisionmaking process.

that her subordinates were involved with light duty decisions, but that she only monitored them on a policy level, and was not aware of individual decisions. In order to show that Pierce intentionally discriminated against her, Ascolese was required to demonstrate that Pierce had some specific involvement in the consideration of her light duty request. Because she has not done so, Ascolese cannot maintain a section 1983 claim against Pierce.

 Ascolese's section 1983 sex discrimination claims against Evans share common elements with her Title VII sex discrimination claims. In *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1483 n. 4 (3rd Cir.1990), the Third Circuit compared the elements of Title VII and § 1983 claims. The common elements noted by the Third Circuit include the fact of discrimination based on sex and the existence of harm to the plaintiff, or "subjective" harm; elements of difference noted by the Third Circuit include the "objective element" of a Title VII action, which is not a requirement in section 1983 actions. *Id.*[20] To the extent that Ascolese has failed to make a showing on a "common" element of a Title VII claim, the corresponding section 1983 claim must be dismissed. Thus, because Ascolese has failed to make out a case of hostile environment sexual harassment against SEPTA under Title VII, she cannot bring an analogous claim under section 1983 against Evans.

 As against Evans, Ascolese also asserts the section 1983 equivalents of her retaliation and sex discrimination claims. Because Ascolese has succeeded in showing the existence of the common elements of these claims under Title VII, she can maintain the analogous claims against Evans under section 1983. Evans was a public employee

acting in his official capacity, and hence was a state actor acting under color of state law for purposes of section 1983. *See West v. Atkins,* 487 U.S. 42, 49–50, 108 S.Ct. 2250, 2255–56, 101 L.Ed.2d 40 (1988).

 Finally, it appears that Ascolese can maintain a section 1983 sex discrimination claim against van de Beek. Van de Beek, like Evans, was a public employee acting in his official capacity during his examination of Ascolese, and hence was a state actor acting under color of state law for purposes of section 1983. *See id.* Ascolese's section 1983 claim is best characterized as a claim of sexual harassment amounting to intentional discrimination. Because the analysis under section 1983 focuses on intentional discrimination, it differs from that under Title VII, in which the focus is on whether or not the sexual harassment altered the conditions of the victim's employment. *See Bohen v. City of East Chicago,* 799 F.2d 1180, 1187 (7th Cir.1986).

There is some dispute between the parties as to what occurred at van de Beek's examination of Ascolese. SEPTA asserts that one alleged event at this examination, van de Beek's pressing against Ascolese, did not occur at all.[21] SEPTA also provides expert evidence that most of the remaining elements of the examination were either attempts to put Ascolese at ease (e.g, the doctor's request to Ascolese that she call him "Louie") or were medically appropriate examination procedures (the examination of Ascolese's spine and hips and the abdominal examination).[22] Ascolese does not provide any evidence to the contrary.

 A jury that credited Ascolese's version of the facts, finding that van de Beek did press against Ascolese during his examina-

---

**20.** The "objective element" referred to by the *Andrews* court is a reference to its requirement, as one of the five elements of a hostile environment sexual discrimination claim that it identifies, that the discrimination would "detrimentally affect a reasonable person of the same sex in that position." *See id.* at 1482.

**21.** SEPTA asserts that Ascolese did not claim that van de Beek pressed against her from behind until quite recently, and that the fact that she did not make this claim when she discussed

the incident previously suggests that the asserted event did not happen. (Defendants' Motion for Summary Judgment, n. 4.) This is a disputed question of fact inappropriate for resolution on a motion for summary judgment.

**22.** Thus, for instance, SEPTA's expert witness asserts that van de Beek's request that Ascolese move her hips was an ordinary test for scoliosis, and that an ordinary abdominal examination may entail touching a patient's pubic hair.

tion of her, could also conclude that, although the other components of van de Beek's examination of Ascolese were individually appropriate elements of a medical examination, the juxtaposition of these elements was intentional and amounted to discrimination. Van de Beek's alleged conduct occurred only once. However, "[a]s a general matter, a single discriminatory act against one individual can amount to intentional discrimination for equal protection purposes." *See Bohen,* 799 F.2d at 1186–87. Moreover, van de Beek's alleged behavior—unwanted intimate physical contact during a physical examination—is severe, physically threatening, and humiliating, suggesting, by analogy to *Harris* (which of course does not apply directly) that it amounted to "sexual harassment".

## C. Sex Discrimination Claims: Liability of SEPTA

■ Under *Monell v. Department of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978), municipalities and their entities are not subject to *respondeat superior* liability under section 1983; rather, they may be held liable under section 1983 only when the deprivation of rights occurs as a result of "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or an informal but established custom within the organization. *Id.* at 690–91, 98 S.Ct. at 2035–36. Under this standard, SEPTA cannot be held liable for the alleged conduct of van de Beek, as Ascolese has not shown that SEPTA had either a policy or a custom of permitting its medical personnel to harass employees.

■ As to SEPTA's liability for Evans's alleged conduct, Ascolese asserts that SEPTA had a custom of granting light duty in some cases to those disabled off-duty, despite its stated policy of not doing so. Ascolese has not shown, however, that SEPTA had a custom of holding all pregnant women's light duty requests to high evidentiary standards. Rather, it appears that Evans had some dis-

cretionary role in deciding whether and when to grant a light duty request. Alternately, if Ascolese shows that SEPTA delegated complete discretion to Evans to make light duty decisions, then his conduct would amount to SEPTA's "policy", and would be attributable to SEPTA. *See Williams v. Butler,* 863 F.2d 1398, 1402 (8th Cir.1988) (en banc), *cert. denied,* 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989). This also does not appear to be the case, however, as Evans would seem to have shared the authority to make light duty decisions at the very least with Chief Ronald Sharpe. *See* Deposition of Richard Evans, Plaintiff's Exhibit 40 (citing an instance in which Sharpe had made a light duty decision). Thus, SEPTA cannot be said to have delegated all responsibility for light duty decisions to Evans. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 130, 108 S.Ct. 915, 928, 99 L.Ed.2d 107 (1988) ("Simply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy."). Thus, neither the conduct of van de Beek nor that of Evans can be attributed to SEPTA, and Ascolese cannot maintain a section 1983 claim against SEPTA based upon their conduct.

## IV. Fourth Amendment Claims Based upon Pregnancy Testing of Ascolese

Ascolese also claims that SEPTA violated her privacy rights by requiring that she take a pregnancy test as a part of her physical examination. The physical examination was intended to establish a baseline from which to measure employee fitness. As a part of this examination, SEPTA administered a pregnancy test to ensure that pregnant women employees did not begin a remedial fitness program without first consulting their physicians. *See* Deposition of Dr. Louis van de Beek, Defendant's Exhibit F. The test, which was apparently a urine test,[23] was to be administered to all of the female employees who were to undergo the fitness pro-

---

23. The papers of both parties describe the test as a blood test, but without citing any authority for this description. *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, p. 25; Defendants' Reply

Memorandum, p. 16. However, van de Beek, a physician involved in the testing program, described the test as a urine test in his deposition, and the court will proceed on the assumption that the test involved was a urine test.

gram. There is no firm evidence that Ascolese was actually tested. As already noted, however, this may be because Judith Pierce, following an investigation of the fitness-testing program that concluded, *inter alia*, that no further pregnancy testing should occur without the tested patients' express consent, later ordered that all records of the test results be removed from SEPTA employees' files. *See* Memorandum from Judith Pierce to the File, October 28, 1991, Plaintiff's Exhibit 12. A pregnancy test certainly appears to have been planned, and at least some employees presumably were tested (creating the records that were later removed from their files); moreover, SEPTA's change of policy appears to have come some time after Ascolese's examination. Thus, for purposes of this motion for summary judgment, the court will assume, based upon the foregoing circumstantial evidence, that the test occurred.

█ As far as this court can determine, Ascolese's claim that a governmentally-mandated pregnancy test violates the Constitution is a novel one. Although Ascolese characterizes her claim generally as one of violation of privacy, cases involving governmentally-compelled urine samples have been analyzed as "searches" under the Fourth Amendment, *see Vernonia School District v. Acton,* —— U.S. ——, ——, 115 S.Ct. 2386, 2396, 132 L.Ed.2d 564 (1995); *Skinner v. Railway Labor Executives Association,* 489 U.S. 602, 617, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639 (1989), and that is how the court will construe her claim.[24] In this case, SEPTA would have requested a urine sample in any event, in order to conduct a routine urinalysis and to test for substance abuse and for medications, *see* Deposition of van de Beek, *supra.* The Fourth Amendment analysis is appropriate nevertheless; a government employee has a privacy interest in the information contained in his or her urine as well as a privacy interest in not providing a urine sample. *See Anonymous Fireman v. City of Willoughby,* 779 F.Supp. 402, 415 (N.D.Ohio 1991) (holding that an HIV test

was a search even though conducted as part of a routine blood test at a physical examination).

█ Ordinarily, a governmental search would require a warrant and probable cause. Under the Supreme Court's "special needs" line of cases, however, there is an exception to this rule when "special needs, beyond the normal need for law enforcement, make the warrant and probable cause requirements impracticable." *See New Jersey v. T.L.O.,* 469 U.S. 325, 351, 105 S.Ct. 733, 747, 83 L.Ed.2d 720 (1985). In "special needs" cases, the courts have generally balanced the legitimate governmental interests and the privacy interests involved in order to determine whether the warrant and probable cause requirements may be dispensed with. Most recently, the Supreme Court has balanced a school district's interest in preventing drug use by student-athletes through urine testing against the athletes' privacy interests in the information contained in their urine, finding that the school district's interests prevail. *See Vernonia,* —— U.S. at ——, 115 S.Ct. at 2396. The courts have also applied a "special needs" analysis to find that school officials need not have a warrant or probable cause before conducting a search of a student, provided that the search itself is reasonable under all the circumstances, *see T.L.O.,* 469 U.S. at 341, 105 S.Ct. at 742; that a warrant and probable cause were not required under a policy requiring drug and alcohol testing of railroad employees in certain circumstances, such as after accidents, *see Skinner v. Railway Labor Executives Association,* 489 U.S. 602, 619–33, 109 S.Ct. 1402, 1414–22, 103 L.Ed.2d 639 (1989); and that mandatory HIV testing of employees of an institution for the care of the mentally retarded without a warrant or probable cause was not justified given the "trivial" risk of HIV transmission involved, *see Glover v. Eastern Nebraska Community Office of Retardation,* 867 F.2d 461, 464 (8th Cir.1989).

---

24. As van de Beek describes it in his testimony, the pregnancy test appears to have occurred as part of an official SEPTA policy, so that the test can form the basis for a § 1983 action against SEPTA. *See Monell v. Department of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978).

# 550

## A. Probable Cause Requirement.

 There are distinct "special needs" analyses for the warrant and probable cause requirements, although a similar balancing process occurs in each analysis.[25] The appropriate analysis for the probable cause requirement in this case compares SEPTA's interest in conducting a general testing program with the privacy interests of SEPTA's employees. To begin with the privacy interests at stake, SEPTA employees have a very strong interest in maintaining the privacy of information related to their pregnancy (or non-pregnancy). The strength of this interest is a corollary of the strong privacy interest in decisions regarding pregnancy generally, see Griswold v. Connecticut, 381 U.S. 479, 485–86, 85 S.Ct. 1678, 1682–83, 14 L.Ed.2d 510 (1965). In addition to their direct interest in maintaining their privacy as to the fact of their pregnancy, SEPTA's employees might have a wide range of other reasons to wish to avoid a pregnancy test. These could include fear of disclosure to fellow employees; the desire to avoid disclosing a subsequent miscarriage or abortion; and the desire to avoid possible stigma or discrimination by their employer. The reasonable expectations of privacy of a police officer may be somewhat diminished because of intrusions on privacy ordinarily associated with her profession. Cf. Vernonia, —— U.S. at ——–——, 115 S.Ct. at 2392–93 (stating that, inter alia, the "communal undress" of locker rooms and the physical examinations associated with student participation in athletics reduce athletes' reasonable expectations of privacy). The parties have not presented arguments on this question, however, and the facts as they stand at present do not indicate that Ascolese's reasonable expectations of privacy as to pregnancy testing were significantly diminished by her work circumstances.

The privacy interests at stake are sufficiently strong to require that SEPTA demonstrate a compelling interest in conducting the pregnancy test in question.[26] SEPTA has come close to demonstrating such an interest. SEPTA's remedial fitness program, and its associated pregnancy test, appear to have been conducted with a regulatory, preventative purpose, a type of goal that has often been endorsed by the Supreme Court in "special needs" cases. See National Treasury Employees Union v. Von Raab, 489 U.S. 656, 668, 109 S.Ct. 1384, 1392, 103 L.Ed.2d 685 (1989), citing Camara v. Municipal Court of San Francisco, 387 U.S. 523, 535–36, 87 S.Ct. 1727, 1734–35, 18 L.Ed.2d 930 (1967). The fitness of SEPTA's employees is important to their performance; a police officer, in particular, must be physically fit in order to perform at least some duties well. Cf. Skinner, supra, 489 U.S. at 627, 109 S.Ct. at 1418 (citing physical fitness of railroad employees as essential to safety). Plaintiffs also do not rebut the defense's assertion that pregnant women should not undergo the rigors of SEPTA's particular fitness program without consulting their doctors.

SEPTA has not, however, demonstrated that there was no practicable way of designing its fitness program so that it could effectively ensure its employees' fitness at minimal risk of harm to pregnant employees. The burden of making such a showing rests upon SEPTA. See Anonymous Fireman v. City of Willoughby, 779 F.Supp. 402, 417

---

**25.** Justice Scalia's analysis in his majority opinion in Vernonia seems to have departed somewhat from the Supreme Court's previous analytical methods, as it did not distinguish the probable cause and warrant inquiries, instead conducting a single inquiry into the reasonableness of the search involved. See Vernonia, —— U.S. at ——, ——, 115 S.Ct. at 2390, 2396. The Court did not present any explanation for this change in approach, but the change appears to have rested in part on Justice Scalia's finding that the warrant requirement was inapplicable in many public-school contexts, as it "would unduly interfere with the maintenance of the swift and informal disciplinary procedures [that are] needed."

See id., at ——, 115 S.Ct. at 2391 (quoting T.L.O., 469 U.S. at 340, 105 S.Ct. at 742). In the case at hand, by contrast, a quite strong argument can be made that the warrant requirement may apply.

**26.** In Vernonia, Justice Scalia suggested that the governmental interest at stake need not always be a compelling one, merely one "important enough to justify the particular search at hand, in light of other factors which show the search to be relatively intrusive upon a genuine expectation of privacy." Vernonia, —— U.S. at ——– ——, 115 S.Ct. at 2394–95 (emphasis omitted).

(N.D.Ohio 1991) ("Whenever a government agency wants to order mandatory testing of its employees, the burden is on that agency to prove that mandatory testing is necessary...."). Considerable thought was apparently given to the design of SEPTA's fitness program; thus, SEPTA presumably had some basis for believing that the program could not easily be designed in such a way as to avoid any risk to the health of pregnant women. (The fact that SEPTA apparently later "discontinued" pregnancy testing, see Defendant's Reply Brief at 16, does call this hypothesis into question, however.) Had SEPTA made such a showing, it might well have prevailed on its motion for summary judgment, at least as to the question of probable cause.

B. *Warrant Requirement.*

█ Turning to the warrant requirement, the inquiry focuses on whether, in the circumstances at issue, the warrant requirement's purpose of protecting individuals against arbitrary governmental action outweighs the burden that obtaining a warrant would impose upon SEPTA.[27] To begin with the latter element, requiring SEPTA to obtain a warrant before testing its employees for pregnancy would certainly impose some burden upon SEPTA: SEPTA would need to familiarize one or more of its employees with warrant procedures, and would need to obtain a warrant in those cases in which its employees did not grant their consent for the pregnancy test. This burden falls far short of that at issue in many other "special needs" cases, however. SEPTA cannot argue that it is important that a pregnancy test be administered unexpectedly; this distinguishes SEPTA's testing program from those at issue in the many "special needs" cases that have involved circumstances in which an element of surprise was necessary to achieving the purpose of the search. These include, for instance, cases permitting warrantless searches by probation officials of a probation-

er's home, see *Griffin v. Wisconsin,* 483 U.S. 868, 876, 107 S.Ct. 3164, 3170, 97 L.Ed.2d 709 (1987), and permitting warrantless inspections of automobile junkyards for stolen cars, *New York v. Burger,* 482 U.S. 691, 710, 107 S.Ct. 2636, 2648, 96 L.Ed.2d 601 (1987). Nor is there any urgent need to administer the test quickly, unlike the test at issue in *Skinner,* which had to be administered to railroad employees after an accident before traces of drugs or alcohol were fully metabolized. See *Skinner, supra,* 489 U.S. at 623, 109 S.Ct. at 1416. Nor is the need to conduct the pregnancy tests likely to be so frequent or to arise so unexpectedly as to render a warrant requirement extraordinarily burdensome, in contrast, for instance, with employers' frequent need to seek documents in employees' offices, see *O'Connor v. Ortega,* 480 U.S. 709, 721–22, 107 S.Ct. 1492, 1499–1500, 94 L.Ed.2d 714 (1987).

Turning to the purposes of the warrant requirement, the Supreme Court identified the principal functions of a warrant in *Skinner* as (a) that of limiting the enforcement discretion of the officials involved, and (b) that of "assur[ing] the citizen that the intrusion is authorized by law, and that it is narrowly limited in its objectives and scope." 489 U.S. at 622, 109 S.Ct. at 1416. In *Skinner,* the Court found that the warrant's purpose of limiting enforcement discretion was served by the existing testing scheme, which defined the circumstances under which testing would occur very specifically, for instance requiring testing after certain specified rule violations, see *id.* at 622 & n. 6, 109 S.Ct. at 1416 & n. 6; *see also Von Raab,* 489 U.S. at 667, 109 S.Ct. at 1391. The testing scheme at issue here seems to have been similarly nondiscretionary in nature.

As to the second function of the warrant requirement, that of providing persons with notice of the official character and permissible scope of a search, the Court has not

---

**27.** The court will assume that the warrant and probable cause analyses are independent. In *Griffin v. Wisconsin,* 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), the Court, in a majority opinion by Justice Scalia, stated that the Constitution's assertion that "no Warrants shall issue, but upon probable cause" precluded courts from requiring searches to be conducted with warrants but without imposing a probable cause requirement. The Court also observed, however, that its cases have "arguably come to permit an exception to that prescription for administrative search warrants." *Id.* at 877, 107 S.Ct. at 3170. Given the inherently suspicionless nature of the search at issue, this court will assume that it falls within that category.

always required some functional equivalent of this purpose of a warrant in permitting a warrantless search. For instance, the Court did not cite any substitute for this function of a warrant in permitting school officials to search schoolchildren without a warrant or probable cause, *see New Jersey v. T.L.O.,* 469 U.S. 325, 340, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985). However, in many cases the Court has cited some substitute for this function of a warrant as an important reason for permitting a warrantless search. In *Skinner* and *Von Raab,* for instance, the Court noted that the drug testing schemes at issue involved rules that "doubtless are well known to covered employees," *Skinner,* 489 U.S. at 622, 109 S.Ct. at 1416; *see also Von Raab,* 489 U.S. at 672 n. 2, 109 S.Ct. at 1394 n. 2. In *Von Raab,* the employees were also provided with individual notice of the forthcoming test, *see id.* In the latter case, the Court explained that the fact that employees had advance notice of the testing requirement "reduce[d] to a minimum any 'unsettling show of authority.'" associated with the test. *Id.* (quoting *Delaware v. Prouse,* 440 U.S. 648, 657, 99 S.Ct. 1391, 1398, 59 L.Ed.2d 660 (1979)). By contrast, SEPTA concedes that Ascolese was told only after her urine sample was taken that it would be used for a pregnancy test, and there is no indication that SEPTA employees were notified generally of the existence of a pregnancy-testing requirement.

On the present facts, SEPTA's motion for summary judgment as to the warrant requirement cannot be granted. Denial of the motion does not amount to a determination as a matter of law that SEPTA was required to secure a warrant before administering a pregnancy test to Ascolese without notice. However, at this stage of the case it would be premature to foreclose that possibility. Past cases in which the Supreme Court has found a warrant to be unnecessary have generally noted that a warrant requirement would serve no useful purpose on the facts before them. *See, e.g., Skinner, supra,* 489 U.S. at

623, 109 S.Ct. at 1416. On the present record, by contrast, it is easy to conceive of a reason for a warrant requirement: a warrant would have ensured that SEPTA employees had advance notice of the pregnancy test and of its officially sanctioned character.[28] SEPTA has now concluded that it will seek its employees' consent before conducting any further pregnancy tests. Were SEPTA required to secure a warrant before conducting no-notice testing, it might have adopted a similar approach from the outset.

## V. Section 1985(3) Claim

Ascolese's complaint asserts three broad claims of conspiracy, whose precise legal basis is unclear. The complaint states that "[d]efendants conspired to violate Plaintiff's rights, and did violate them by retaliating against Plaintiff for originally asserting her protected right to be free from sexual harassment and to be free from having to work in a sexually hostile environment," that "[d]efendants conspired to harass and discriminate against Plaintiff based on her being female," and that "[d]efendants conspired to harass and discriminate against Plaintiff based on her being white." Complaint, Count Five, ¶ 2; Count Eight, ¶¶ 6, 7.

Despite the vagueness of these allegations, and their failure to identify the members or nature of the conspiracy in question, the court will briefly consider whether they state a claim under 42 U.S.C. § 1985(3), which provides a cause of action for certain conspiracies to violate civil rights. Under that statute, "[i]f two or more persons ... conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws," the members of this conspiracy shall be subject to an action for damages by any person whom the conspiracy harms. 42 U.S.C. § 1985(3).

Ascolese does not make any showing that any SEPTA employees acted in concert to deprive her of her constitutionally protected

---

**28.** Consider Ascolese's account of her encounter with van de Beek. Supposing this account to be true, he told her in the course of engaging in conduct that she claims amounted to sexual harassment that he intended to administer a

pregnancy test to her, a remark that might well have seemed particularly threatening in that context. Providing Ascolese with some notice of the officially sanctioned nature of the pregnancy test would have prevented this (hypothetical) result.

rights. At most, she has shown that Evans was aware that Ascolese had filed a complaint after her examination by van de Beek. She has alleged no facts that would suggest that Pierce had any role in her alleged harassment by van de Beek, that other SEPTA employees had any role in Pierce's treatment of her, or that Pierce, Sharpe or van de Beek had any role in Evans's conduct towards her or the handling of her request for light duty. *See Santiago v. City of Philadelphia,* 435 F.Supp. 136, 155 (E.D.Pa.1977) ("Conspiracy in this [§ 1985(3)] context means that the co-conspirators must have agreed, at least tacitly, to commit acts which will deprive plaintiff of the equal protection of the law.") Thus, judgment must be entered against her on this claim. It is therefore not necessary to consider SEPTA's arguments that, *inter alia,* section 1985(3) does not apply because a corporation cannot conspire with itself.

## VI. Common–Law Tort Claims

Ascolese appears to allege four common-law tort claims: intentional infliction of emotional distress, negligent supervision, invasion of privacy, and a claim that she characterizes as "conspiracy". (Ascolese's complaint is somewhat unclear as to which common-law claims it asserts. However, Ascolese's papers characterize her complaint as asserting these four claims,[29] and they can all be broadly discerned in her complaint.)

SEPTA asserts that it is immune to these claims under Pennsylvania's official immunity and sovereign immunity statutes, or, in the alternative, that these claims are barred by the underlying substantive law.

█ To begin with Ascolese's claim for intentional infliction of emotional distress, assuming that Pennsylvania recognizes the tort of intentional infliction of emotional distress, a question that appears to still be open,[30] this claim appears to be barred under applicable Pennsylvania law.[31] That law requires plaintiffs claiming intentional infliction of emotional distress to present expert medical evidence of harm. *See Kazatsky v. King David Memorial Park Inc.,* 515 Pa. 183, 527 A.2d 988, 995 (1987); *Williams v. Guzzardi,* 875 F.2d 46, 50–53 (3d Cir.1989). Ascolese has not presented any such evidence at this stage, and has not provided any more than conclusory allegations of mental and emotional harm.

█ Turning to Ascolese's claim of "gross negligence," it appears to amount to a claim that SEPTA was negligent in its supervision of van de Beek, or that SEPTA was negligent in failing to assign a nurse to be present during his examination of Ascolese. These claims cannot be sustained, as Ascolese has not presented any factual basis for her claim that SEPTA was aware that van de Beek harassed female patients.[32]

29. *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, p. 20. Oddly, Ascolese's memorandum states that "Ascolese's claims for intentional infliction of emotional distress, gross negligence, invasion of privacy and conspiracy are cognizable under 42 U.S.C. § 1983," and that, because SEPTA is not immune to section 1983 actions, SEPTA may not avail itself of its sovereign immunity with respect to these claims. This assertion can be interpreted in two ways. Under one reading, it states, incorrectly, that the unavailability of municipal sovereign immunity in section 1983 actions also eliminates any immunity to common-law causes of action. (In fact, sovereign and official immunity bar one of Ascolese's common-law claims, and could well also bar the others, although the court does not reach that question as those claims are barred under the applicable substantive law.) Under the alternative reading, Ascolese's complaint (whose ambiguity has already been noted) should not be read to assert any common-law causes of action at all, only section 1983 claims. The court will adopt

the first reading, and proceed with an analysis of the viability of Ascolese's common-law claims.

30. *See Silver v. Mendel,* 894 F.2d 598, 606 (3d Cir.1990), *cert. denied,* 496 U.S. 926, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990) (concluding that, despite some questions on this point, Pennsylvania's highest court is likely to recognize the tort of intentional infliction of emotional distress).

31. Because Ascolese's claims for intentional infliction of emotional distress will be dismissed on other grounds, the court need not reach SEPTA's argument that these claims are barred by the Pennsylvania Workers' Compensation Act.

32. Thus, it is not necessary to reach the question of whether these claims would be admissible under 42 Pa.Cons.Stat.Ann. § 8522(b)(2)'s waiver of immunity for "acts of health care employees of Commonwealth agency medical facilities or institutions or by a Commonwealth party who is a doctor, dentist, nurse, or related health care personnel."

Ascolese's invasion of privacy claim appears to be based upon SEPTA's alleged administration of a pregnancy test to her without her consent. The Third Circuit has found it likely that the Supreme Court of Pennsylvania would, if faced with the question, adopt the definition of the tort of invasion of privacy appearing in the Restatement of Torts. *See Borse v. Piece Goods Shop, Inc.*, 963 F.2d 611, 620 n. 8 (3rd Cir.1993). The Restatement distinguishes between four classes of invasion of privacy claim. *See Restatement (Second) of Torts* § 652A. The type of claim relevant to this case, "intrusion upon seclusion," is an intentional tort claim, according to Section 652B of the Restatement. SEPTA is immune to intentional tort claims, however, as Pennsylvania's waiver of sovereign immunity waives immunity only "for damages arising out of a negligent act," *see* 42 Pa.Cons.Stat.Ann. § 8522; *see also Freedman v. City of Allentown*, 128 Pa. Cmwlth. 126, 562 A.2d 1012, 1015 (1989). SEPTA's employees are also generally entitled to official immunity for actions taken in the course of their duties. *See* 42 Pa.Cons. Stat.Ann. §§ 8545, 8546. To the extent that the injurious acts of SEPTA's employees constitute "a crime, actual fraud, actual malice, or willful misconduct," they are not entitled to official immunity for their actions. *See* 42 Pa.Cons.Stat.Ann. § 8550; *see also Dobson v. Green*, 596 F.Supp. 122, 125 (E.D.Pa.1984) (finding that charges of assault and battery against police officers for beating plaintiff meet standard for willful misconduct under § 8550). The conduct of van de Beek and Pierce, the SEPTA employees involved in allegedly administering the pregnancy test to Ascolese, cannot be said to amount to "a crime, actual fraud, actual malice, or willful misconduct." Thus, they, too, are immune to an action for invasion of privacy.

Finally, the court must consider the claim that Ascolese characterizes as "conspiracy". This court is not aware of any independent tort of conspiracy. Although it is conceivable that Ascolese intended to allege that the defendants acted in concert to commit some other, unspecified, intentional tort, Ascolese has not made that claim with any precision or detail, and this court does not believe that it is the court's function to tease a cognizable claim out of the complaint's obscure words.

*VII. Conclusion*

To summarize, SEPTA's motion for summary judgment is granted, except as to: (a) Ascolese's Title VII retaliation and gender-based disparate treatment claims against SEPTA based upon events occurring after November 21, 1991, (b) her section 1983 sex discrimination claims against Evans and van de Beek, and (c) her section 1983 pregnancy testing claim against SEPTA.