Lisa ASCOLESE

v.

SOUTHEASTERN PENNSYLVANIA
TRANSPORTATION
AUTHORITY,

Louis Van De Beek, individually and
as a SEPTA Medical Doctor,

Judith Pierce, individually and as SEPTA
Chief Administrative Officer,

Richard J. Evans, individually and as
SEPTA Deputy Chief of Police,

Ronald Sharpe, individually and
as SEPTA Chief of Police.

Civil Action No. 93–1461.

United States District Court,
E.D. Pennsylvania.

April 17, 1996.

Francis J. McGovern, Jr., Merri R. Lane, Merri R. Lane, P.C., Philadelphia, PA, for plaintiff.

Saul H. Krenzel, Saul H. Krenzel & Assoc., Philadelphia, PA, for defendants.

## OPINION

LOUIS H. POLLAK, Senior District Judge.

On September 28, 1995, I issued an opinion ruling on a motion for summary judgment by the defendants. *See Ascolese v. Southeast-*

*ern Pennsylvania Transportation Authority,* 902 F.Supp. 533 (E.D.Pa.1995). On October 12, the defendants filed a motion for reconsideration contesting my denial of their motion for summary judgment as to a number of Ascolese's claims. The defendants' motion contained evidence which had been available to the defendants at the time of their first motion for summary judgment, and which it therefore would not ordinarily be appropriate to consider in connection with a motion whose purpose is "to correct manifest errors of law or fact or to present newly discovered evidence." *Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir.1985). However, I found, in a memorandum dated February 22, 1996, that "[t]he plaintiff's legal claims and the applicable legal standards were sufficiently ambiguous at the time that the defendants moved for summary judgment" that it was fair to allow the defendants a further opportunity to meet the plaintiff's claims. Memorandum of February 22, 1996, at 2. Because of these unusual circumstances, I found that it would be appropriate to treat the defendants' motion for reconsideration as a renewed motion for summary judgment, and provided the plaintiff, Lisa Ascolese, with a period of time in which to make submissions appropriate to such a motion. That period has now passed.

## I. *Background*

Ms. Ascolese works as a transit police officer for one of the defendants, the Southeastern Pennsylvania Transportation Authority, or SEPTA. The other two defendants are both SEPTA employees: Richard Evans is Deputy Chief of SEPTA's transit police, and Dr. Louis van de Beek is a medical doctor employed by SEPTA. Ascolese's complaint initially made a broad range of claims against these and other defendants. In my previous opinion in this case, I found that summary judgment should be entered in favor of the defendants as to all but three of Ascolese's claims. Those three claims were: (1) a section 1983 claim against SEPTA based upon a pregnancy test that Ascolese claimed SEPTA had administered to her on or after October 4, 1991; (2) a section 1983 sex discrimination claim against van de Beek based upon van de Beek's alleged sexual harassment of Ascolese during his examination of her on October 4, 1991; and (3) claims of sex discrimination and retaliation brought under both Title VII (against SEPTA) and section 1983 (against Evans) based upon Ascolese's difficulties in securing a light duty position when she became pregnant in the spring of 1992.

The defendants argue that summary judgment should have been entered in their favor as to all three of these claims. I will consider them in turn.

## II. *Ascolese's Pregnancy Testing Claim*

My previous opinion in this case gave the following summary of the facts forming the basis of Ascolese's pregnancy testing claim:

> Ascolese also claims that SEPTA violated her privacy rights by requiring that she take a pregnancy test as a part of her physical examination. The physical examination was intended to establish a baseline from which to measure employee fitness. As a part of this examination, SEPTA administered a pregnancy test to ensure that pregnant women employees did not begin a remedial fitness program without first consulting their physicians. *See* Deposition of Dr. Louis van de Beek, Defendant's Exhibit F. The test, which was apparently a urine test, was to be administered to all of the female employees who were to undergo the fitness program. There is no firm evidence that Ascolese was actually tested. As already noted, however, this may be because Judith Pierce, following an investigation of the fitness-testing program that concluded, *inter alia,* that no further pregnancy testing should occur without the tested patients' express consent, later ordered that all records of the test results be removed from SEPTA employees' files. *See* Memorandum from Judith Pierce to the File, October 28, 1991, Plaintiff's Exhibit 12. A pregnancy test certainly appears to have been planned, and at least some employees presumably were tested (creating the records that were later removed from their files); moreover, SEPTA's change of policy appears to have come some time after

Ascolese's examination. Thus, for purposes of this motion for summary judgment, the court will assume, based upon the foregoing circumstantial evidence, that the test occurred.

*Ascolese,* 902 F.Supp. at 548–49 (footnote omitted). Ascolese's claim is that SEPTA's pregnancy test was a "search" conducted in violation of the Fourth Amendment. When searches are performed as part of a regulatory program of some sort, rather than for law-enforcement reasons, their permissibility is subject to a "special needs" analysis, which balances the governmental interest in conducting the search against the individual's privacy interest in the information at issue. *See New Jersey v. T.L.O,* 469 U.S. 325, 351, 105 S.Ct. 733, 747, 83 L.Ed.2d 720 (1985). SEPTA contests my analysis of the balance of these interests in this case, contending both that SEPTA's interest in testing Ascolese is greater than I concluded in my previous opinion and that Ascolese's reasonable expectations of privacy are lower than my previous opinion found. SEPTA also challenges my previous opinion's conclusion that there was a genuine issue of material fact as to whether SEPTA was required to obtain a warrant in order to conduct the pregnancy test.

A. *SEPTA's Interest in Pregnancy Testing Its Employees.*

■ My previous opinion observed that SEPTA did have a very strong interest in conducting a fitness program, and that the plaintiff had not rebutted SEPTA's assertion that pregnant women should not undertake SEPTA's fitness program, but that SEPTA had not demonstrated that it was impossible to structure the fitness testing program to avoid harm to pregnant employees. SEPTA has now submitted an affidavit from an expert witness who asserts that SEPTA could not have made its fitness program less rigorous in order to accommodate pregnant employees without compromising the program's effectiveness. *See* Affidavit of Paul O. Davis, Exh. E to Defendants' Motion for Reconsideration, at 2.

I find, however, that on the present record SEPTA has still not demonstrated a particularly strong interest in conducting the preg-

nancy test in question. This is because SEP-TA's testing is unusual in that it is intended exclusively to protect the tested officer herself and her fetus, rather than being directed at protecting a broader population. So far as I am aware, the Supreme Court's "special needs" cases have all—with one exception, which I will address in a moment—involved searches directed at promoting the safety or interests of a broader population than the tested individual. *See, e.g. Skinner v. Railway Labor Executives Association,* 489 U.S. 602, 628, 109 S.Ct. 1402, 1419, 103 L.Ed.2d 639 (1989) (upholding a policy of drug and alcohol testing of railroad employees intended to prevent railroad accidents); *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 670, 109 S.Ct. 1384, 1393, 103 L.Ed.2d 685 (1989) (upholding a policy of drug testing of customs officials intended to ensure their fitness to interdict drugs and operate firearms); *New Jersey v. TLO,* 469 U.S. 325, 341, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985) (upholding searches of public-school students on the basis of the "substantial need of teachers and administrators for freedom to maintain order in the schools").

The exception to this rule is *Vernonia School District 47J v. Acton,* —— U.S. ——, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), in which the Court endorsed drug testing of student athletes in part on the ground that such testing would help to prevent injury to the athletes themselves. *See id.* at ——, 115 S.Ct. at 2395. This ground, however, was only one of several cited by Justice Scalia in his opinion for the Court; others included the risk of harm to other athletes "with whom [the tested student] is playing his sport," *see id.,* and "the 'role model' effect of athletes' drug use," *id.* at ——, 115 S.Ct. at 2396. By contrast, SEPTA does not here cite any group that would be protected by its testing policy other than the tested officer and her possible fetus.

Moreover, to the extent that *Vernonia* found that a school district had a strong interest in promoting the welfare of its students, it did so for reasons that are not applicable here. A paternalistic testing program may have some place in a public school, an institution whose very function is protec-

tive and care-taking in nature. Justice Scalia indicated as much when he observed in *Vernonia* that "the necessity for the State to act is magnified by the fact that this evil is being visited not just upon individuals at large, but upon children for whom it has undertaken a special responsibility of care and direction." *Id.* at ——, 115 S.Ct. at 2395; *see also id.* at —— n. 4, 115 S.Ct. at 2396 n. 4 (stating that the fact that the persons tested are children is "central" to the case). SEPTA does, of course, have some interest in protecting the health of its employees and their children. But it cannot assert that it has undertaken a "special responsibility of care and direction" of the sort that Justice Scalia found to justify drug testing in *Vernonia.*

■ To the extent that SEPTA has an interest in protecting the health of its employees and their children, it could have vindicated that interest by providing Ascolese with full information on the fitness program and strongly advising her to undergo a pregnancy test. This would have been entirely adequate both as to Ascolese and as to her possible fetus. "Decisions about the welfare of future children must be left to the parents who conceive, bear, support and raise them rather than to the employers who hire those parents." *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Johnson Controls, Inc.*, 499 U.S. 187, 206, 111 S.Ct. 1196, 1207, 113 L.Ed.2d 158 (1991).[1] Indeed, this is precisely what SEPTA did when it revised its fitness program: under the new program, female officers are merely "advised to consult their private practitioners for a pregnancy determination prior to beginning fitness testing." Affidavit of Richard Press, M.D., Exhibit C to Defendants' Motion for Reconsideration.[2]

**B.** *Ascolese's Reasonable Expectations of Privacy*

■ My previous opinion concluded that Ascolese's interest in privacy as to pregnancy-related information was very strong, requiring SEPTA to demonstrate a compelling interest in order to justify obtaining that information. In reaching this conclusion, I found that the circumstances in which police officers work may lead them to have somewhat reduced expectations of privacy generally, but that "the facts as they stand at present do not indicate that Ascolese's reasonable expectations of privacy as to pregnancy testing were significantly diminished by her work circumstances." *Ascolese*, 902 F.Supp. at 550.

SEPTA has now submitted an affidavit listing a number of facts that it asserts reduce its police officers' reasonable expectations of privacy. The affidavit indicates that SEPTA police officers share (single-sex) locker and shower facilities, are subject to fitness reviews every three to six months, are given annual medical examinations, and undergo annual testing and training in first aid, CPR, the use of firearms, and self-defense. Affidavit of Richard J. Evans, Exhibit D to Defendants' Motion to Reconsider. SEPTA police officers are also subject to random drug testing. *See Ascolese*, 902 F.Supp. at 537.

It is true that SEPTA's regulation of its employees is quite detailed, and that this regulation may diminish those employees' reasonable expectations of privacy. This diminution is, however, largely limited to their reasonable expectations of privacy as to information related to public safety. SEPTA's drug testing program and first aid, CPR, self-defense, and firearms training pro-

---

**1.** *Johnson Controls* also addressed what may be SEPTA's reason for conducting pregnancy testing—the possible tort liability associated with harm to an employee's future children—in language that would seem to apply, by analogy, here: "If, under general tort principles, Title VII bans sex-specific fetal protection policies, the employer fully informs the woman of the risk, and the employer has not acted negligently, the basis for holding an employer liable seems remote at best." 499 U.S. at 208, 111 S.Ct. at 1208.

**2.** SEPTA observes that it is not necessarily required to adopt the least intrusive approach to achieving its goals. Although this might be true, *see Skinner*, 489 U.S. at 629 n. 9, 109 S.Ct. at 1419 n. 9, it does not mean that SEPTA may adopt any means of achieving its goals that it finds convenient, irrespective of the existence of other means of doing so that are as effective and far less intrusive.

grams all have clear public-safety goals. Its physical examinations and fitness testing are linked less closely with public safety, but do have a public-safety purpose. See Affidavit of Paul O. Davis, Ph.D., Exhibit E to the Defendants' Motion for Reconsideration ("Law Enforcement officers have a public trust to uphold and enforce the law and to effect the arrest of any person committing a felony in their presence. The physical demands of these types of activities can be considerable."). The reasonable expectations of privacy of SEPTA police officers as to the foregoing intrusions "are diminished by reason of their participation in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of covered employees." *Skinner*, 489 U.S. at 627, 109 S.Ct. at 1418.

The *Skinner* Court was careful to note, however, that "[w]e do not suggest . . . that the interest in bodily security enjoyed by those employed in a regulated industry must always be considered minimal." *Id.* at 628, 109 S.Ct. at 1419. Likewise, in *Von Raab*, the Court emphasized the close link between the nature of the customs employees' work and the intrusion at issue: it stated that the employees are "directly involved in the interdiction of illegal drugs" and carry firearms, and so "reasonably should expect effective inquiry into their fitness and probity." 489 U.S. at 672, 109 S.Ct. at 1394. SEPTA's employees, too, must necessarily expect some intrusions upon their privacy that are clearly related to public safety. But a pregnancy test with no public-safety objective is a form of intrusion upon an employee's privacy quite different from most of those to which SEPTA's employees routinely submit.[3] It is true that the pervasive regulation of Ascolese's workplace may modestly reduce her expectations of privacy even as to information unrelated to public safety. But this modest reduction does not lead me to change my conclusion that the privacy interests at stake in this case are considerably stronger than SEPTA's interest in protecting the health of its employees and their prospective children.

### C. *The Warrant Requirement*

■ My previous opinion also noted that SEPTA appears not to dispute Ascolese's claim that she was given no notice before her physical examination that it would include a pregnancy test.[4] I found in that opinion that SEPTA had no reason (other than perhaps a modest bow to administrative convenience) for conducting its pregnancy test without notice, and concluded that SEPTA's failure to give Ascolese notice greatly weakened the case for dispensing with the warrant requirement as to this test. The defendants' motion for reconsideration asserts that it would be burdensome for SEPTA to be required to obtain a warrant before administering a pregnancy test to its employees, and that the absence of any "special" facts for a magistrate to evaluate in considering SEPTA's request for a warrant argues against the application of the warrant requirement. *Cf. Von Raab*, 489 U.S. at 665, 109 S.Ct. at 1390.

As described by the Court in *Von Raab*, the purpose of the warrant requirement is "to advise the citizen that an intrusion is authorized by law and limited in its potential scope and to interpose a neutral magistrate between the citizen and the law enforcement officer." 489 U.S. at 667, 109 S.Ct. at 1391. The Supreme Court has repeatedly found that the infringement upon privacy associated with a search is reduced when there is advance notice. *See, e.g. Skinner*, 489 U.S. at 622, 109 S.Ct. at 1416 (in finding the warrant requirement inapplicable, noting that the testing rules at issue were well-defined and "doubtless are well known to covered employees," which suggested that the formal assurance of a warrant was not necessary); *see also Von Raab*, 489 U.S. at

---

3. By contrast, in *Vernonia*, the Court noted that the student athletes to be subjected to drug testing were already required to submit to a range of intrusions intended both "[f]or their own good and that of their classmates." —— U.S. at —— ——, 115 S.Ct. at 2392–93. The students' reasonable expectations of privacy were therefore reduced both as to intrusions directed at their own safety and as to intrusions directed at the safety of others.

4. Indeed, Ascolese avers that SEPTA only told her of the pregnancy test *after* she had already provided the relevant urine sample.

667, 109 S.Ct. at 1391 (reasoning similarly). Advance notice is valuable because it helps to reduce the " 'unsettling show of authority,' *Delaware v. Prouse*, 440 U.S. 648, 657, 99 S.Ct. 1391, 1398, 59 L.Ed.2d 660 (1979), that may be associated with unexpected intrusions on privacy," *see Von Raab*, 489 U.S. at 672 n. 2, 109 S.Ct. at 1394 n. 2. For these reasons, I concluded in my previous opinion that a warrant might have reassured Ascolese that the pregnancy test was being conducted lawfully.

SEPTA's objections are unpersuasive. The burden associated with obtaining a warrant is relatively small,[5] particularly in comparison with the protection a warrant would afford to the privacy interests of SEPTA employees. Moreover, although it is true that there would be few (or no) facts for a magistrate to evaluate in determining whether to issue a warrant, that argument is only relevant to the warrant requirement's function of limiting official discretion. A warrant would still serve the purpose that I identified as important in this case, that of providing SEPTA employees with notice that the pregnancy test is authorized by law.[6]

### III. *Ascolese's Sexual Harassment Claim against van de Beek*

Van de Beek also contests the denial of his previous motion for summary judgment as to Ascolese's section 1983 sexual harassment claim against him. He argues, first, that there is no evidence that his conduct was intentional; second, that Ascolese has not made a sufficient showing that his conduct amounted to discrimination; and, finally, that he is entitled to qualified immunity as to Ascolese's claim.

### A. *Evidence that van de Beek's Conduct was Intentional*

■ Ascolese cannot make out a section 1983 sexual harassment claim against van de Beek in the absence of evidence that van de Beek's conduct was intentional. *See Bohen v. City of East Chicago, Ind.*, 799 F.2d 1180, 1187 (7th Cir.1986). In my previous opinion in this case, I found that Ascolese had presented some evidence that van de Beek had acted intentionally. The principal evidence to that effect was Ascolese's allegation that van de Beek had pressed against her during a portion of his examination. This contact allegedly occurred while van de Beek conducted a spinal examination of Ascolese which required her to bend over, with her hands on the examination table, and move her hips from left to right, with van de Beek standing behind her. Ascolese alleges that, during this process, van de Beek's body from his waist to his knees was in contact with her. Van de Beek denies that this contact occurred. In the absence of any information as to whether such contact was likely to occur inadvertently during a spinal examination, I concluded that it was possible that a jury might indeed find that the alleged contact was intentional, particularly in light of

---

5. This is true because there is no need to conduct pregnancy testing on short notice, so that the delay associated with obtaining a warrant would not interfere with the purpose of the search. *Cf. New Jersey v. T.L.O.*, 469 U.S. 325, 340, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985) (finding that "requiring a teacher to obtain a warrant before searching a child ... would unduly interfere with the maintenance of the swift and informal disciplinary procedures needed in the schools"). Moreover, a single SEPTA employee could presumably undertake to obtain a large number of warrants at once.

6. I also note that the constitutionality of no-notice pregnancy testing would be questionable even if SEPTA *had* secured a warrant. This is so because, even with a warrant, no-notice pregnancy testing might well run afoul of the Fourth Amendment's prohibition of "unreasonable

searches and seizures." The Court has found that a court's analysis of whether a particular search is "reasonable" necessarily entails an inquiry into "the scope of the particular intrusion, the manner in which it was conducted, the justification for initiating it, and the place in which it was conducted." *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). Whether or not a search is conducted pursuant to notice would seem to be an aspect of the "manner in which [the search] is conducted." One of the many advantages of notice is that it would have permitted those SEPTA employees with privacy concerns about the pregnancy test to have themselves tested before SEPTA's test occurred. Employees who tested negative might have had fewer reservations about revealing that fact than they would have had about undergoing a test whose results would be unknown.

van de Beek's other alleged conduct during the examination.[7]

Van de Beek has now presented a supplemental affidavit from an expert witness, Dr. Eliot Nierman, addressing the question of van de Beek's intent. Dr. Nierman's previous report in this case concluded that van de Beek had "conducted a complete medical examination ... in a manner that was reasonable, acceptable, and within the usual standard of medical care." Defendants' Motion for Summary Judgment, exh. E, at 3. That report did not, however, address Ascolese's allegation that van de Beek had pressed against her during his examination. Van de Beek has now presented the court with a letter from Dr. Nierman addressing that claim. It states: "This is likely to be inadvertent, incidental contact. I do not feel it represents any departure from usual standards of physician behavior. Therefore, my assessment of this case, that Dr. van de Beek did nothing that would be inappropriate during a medical examination, stands." Defendants' Motion for Reconsideration, exh. F.

Dr. Nierman's statement that this contact is likely to have been "inadvertent" or "incidental" does not eliminate all questions of material fact as to van de Beek's intent. First, Dr. Nierman says only that this contact is "likely" to have been inadvertent, suggesting that there may be doubt on this score. Moreover, van de Beek's other conduct, including his suggestion that Ascolese call him "Louie" and his comment on Ascolese's tattoo, can be interpreted either as an unsuccessful effort to put his patient at ease or as evidence of an intent to harass her.[8] I therefore find that there remains a genuine issue of material fact as to whether van de Beek intended to discriminate against Ascolese.

## B. *Evidence that van de Beek's Alleged Conduct Amounted to Discrimination*

■ Van de Beek also asserts that Ascolese has not demonstrated that his alleged conduct amounted to discrimination. In *Bedford v. Southeastern Pennsylvania Transportation Authority*, 867 F.Supp. 288 (E.D.Pa.1994), Judge Waldman analyzed a Title VII sexual harassment claim brought by another SEPTA transit police officer, Sherrie Bedford, against SEPTA. Bedford was examined by van de Beek at approximately the same time that Ascolese was, and alleged quite similar conduct by van de Beek.[9] Judge Waldman concluded that, although most reported sexual harassment cases have involved multiple acts of harassment, "a single act of harassment because of sex may be sufficient to sustain a hostile work environment claim if it is of such a nature and occurs in such circumstances that it may reasonably said to characterize the atmosphere in which a plaintiff must work." 867 F.Supp. at 297. He found that Bedford "cannot reasonably have perceived the encounter with Dr. van de Beek ... as constituting a sexually hostile work environment." *Id.*

■ The present claim is brought under section 1983, and is therefore subject to a different analysis from the Title VII claim at issue in *Bedford*. The focus of an analysis under section 1983 is on "whether the sexual harassment constitutes intentional discrimination," not on whether "the sexual harassment altered the conditions of the victim's employment," the standard under Title VII. *See Bohen*, 799 F.2d at 1187; *see also Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482, 1483 & n. 4 (3rd Cir.1990) (comparing

---

7. This included his complimenting Ascolese on her tattoo during the spinal examination, his statement that she should call him "Louie," and his contact with her pubic hair during an abdominal examination.

8. It is noteworthy that a total of five women apparently made similar complaints about examinations conducted by van de Beek over a single two-day period. *See Bedford v. Southeastern Pennsylvania Transportation Authority*, 867 F.Supp. 288, 293 (E.D.Pa.1994). Once again, these reports could be construed in many ways.

It is possible that they were mistaken; it is possible that van de Beek, with the best of intentions, tends to discomfit his female patients; or it is possible that they are evidence of a consistent discriminatory intent on van de Beek's part.

9. Bedford reported that van de Beek had "intentionally and unnecessarily placed a stethoscope under her brassiere and pressed his pelvic area against her buttocks while examining her back." 867 F.Supp. at 292.

the elements of Title VII and section 1983). In order to demonstrate that she has been subjected to sex discrimination under section 1983, Ascolese must show that she was treated differently than a similarly situated person of the opposite sex would have been. Moreover, the sex discrimination at issue in this case is discrimination by a public official in the course of performing his duties (in this case, a medical examination), rather than discrimination at Ascolese's workplace generally.[10] Thus, there is no need to consider the alleged discrimination in the context of Ascolese's entire work experience, as there would be under Title VII, and as Judge Waldman did in *Bedford;* the relevant context is only that of the examination itself.

▮ There remains the question of what Ascolese must demonstrate to show that sexual harassment by van de Beek amounted to discrimination in the provision of a medical examination. In *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Court found that sexual harassment in the workplace rose to the level of discrimination if it created a "hostile or abusive" working environment. *Id.* at 66, 106 S.Ct. at 2405. By analogy, I find that harassment in the course of a physical examination will amount to sex discrimination if the harassment renders the environment during that examination "hostile" or "abusive." *Cf. Andrews,* 895 F.2d at 1483 n. 4 ("Proof of some [elements of section 1983 and Title VII], particularly discrimination based upon sex and subjective harm[,] is identical. . . .").

In *Harris v. Forklift Systems,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), Justice O'Connor, writing for a unanimous Court, provided some guidance as to how the courts should approach the question whether a work environment is "hostile" or "abusive":

> But we can say that whether an environment is "hostile" or "abusive" can be determined only by looking at all of the circumstances. These may include the frequency

of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Id.* at ——, 114 S.Ct. at 371. The foregoing factors (with the possible exception of "whether [the harassment] unreasonably interferes with an employee's work performance") should presumably also be relevant to the question whether a physical examination was conducted in a "hostile" or "abusive" manner.

Van de Beek asserts that a single incident of sexual harassment cannot amount to actionable sex discrimination. As *Harris* makes clear, this is a mistaken statement of the law applicable to Title VII. Justice O'Connor states that, of the various relevant circumstances she lists, which include "the frequency of the discriminatory conduct," "no single factor is required." It would seem to follow that no particular frequency of harassment is called for by *Harris,* so that one incident could suffice to form the basis for a claim of hostile environment sexual harassment if the other circumstances warranted such a finding. By analogy, a single incident of sexual harassment should also be able to support a section 1983 sexual harassment claim. Indeed, van de Beek proposed rule would seem particularly inappropriate to situations like physical examinations; since such examinations frequently involve only a single encounter, his proposed rule would effectively insulate physicians from section 1983 sexual harassment claims.

*Harris* requires that a court consider "all of the circumstances" in determining wheth-

---

10. In this respect, Ascolese's claim should be treated like any of a number of other claims that a plaintiff could bring for sex discrimination in the administration of a medical examination. Thus, Ascolese could, for instance, have brought suit if van de Beek had found Ascolese physically

unfit solely on the basis of her sex, or had imposed unnecessary and burdensome conditions on the physical examination because of her sex (such as needlessly charging her an additional fee, or requiring her to travel to another city for the examination).

er a particular environment is "hostile" or "abusive." As I noted in my previous opinion, "van de Beek's alleged behavior—unwanted intimate contact during a physical examination—is severe, physically threatening, and humiliating, suggesting, by analogy to *Harris* ... that it amounted to 'sexual harassment.'" I continue to be of the view that a jury could reasonably conclude that van de Beek harassed Ascolese and thereby discriminated against her because of her sex. (A jury could also, of course, reasonably conclude that no harassment occurred.)

## C. *Van de Beek's Right to Qualified Immunity*

 Finally, van de Beek argues that he is entitled to qualified immunity as to Ascolese's section 1983 claim. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

A reasonable physician would, however, have known that intentional sexual harassment of his patients violated "clearly established statutory or constitutional rights." The right to bring claims of workplace sexual harassment based on the equal protection clause was clearly established at the time of the events at issue in this case. *See, e.g., Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482, 1483 & n. 4 (3rd Cir.1990) (discussing the existence of such claims). The step from sexual harassment in the workplace to sexual harassment in the examining room is small, and a reasonable physician would surely have concluded that what is prohibited in the former place is also prohibited in the latter.

Nor can van de Beek assert that, because a reasonable physician, acting with the best of intentions, could have acted as he did, he is entitled to qualified immunity. It is possible that a reasonable physician might have acted as van de Beek is alleged to have acted in this case. However, it is also possible, as I have noted above, that van de Beek's con-

duct was the result of an intent to harass Ascolese. Although qualified immunity analysis generally disfavors inquiry into the subjective knowledge and intentions of government officials, *see Harlow*, 457 U.S. at 816, 102 S.Ct. at 2737, this does not mean that a government official charged with having acted maliciously is to be accorded qualified immunity merely because it is possible that a reasonable official, acting without ill intent, could have acted as he did. *See Tompkins v. Vickers*, 26 F.3d 603, 607–08 (5th Cir.1994) (reaching this conclusion, and citing similar decisions from six other circuit courts). Thus, I find that van de Beek is not entitled to summary judgment as to his qualified immunity claims.

## D. *Van de Beek's Motion to Certify Sexual Harassment Issues for Immediate Appeal*

 Finally, van de Beek has moved to certify two questions for immediate appeal under 28 U.S.C. § 1292(b). That section permits a district court to certify an order for immediate appeal if the court concludes that it "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."

Neither of van de Beek's proposed questions for immediate appeal is one as to which there is "substantial ground for difference of opinion." Van de Beek's first proposed question is: "Does a § 1983 claim for sexual harassment require a plaintiff to establish quid pro quo or a hostile work environment as is required for a Title VII sexual harassment claim?" To some extent, this question is founded on a mistaken premise; as I have indicated above, I have found that, in order to demonstrate that van de Beek discriminated against her, Ascolese must indeed establish that van de Beek created a hostile environment in the course of his examination of her. The element of my analysis with which van de Beek appears to disagree is my finding that his conduct should be analyzed as discrimination by a public official in the course of performing his duties, that is, as discrimination in the course of performing a

medical examination, rather than against the background of Ascolese's entire work experience. However, van de Beek has provided me with no authority that would indicate that his analysis is appropriate. Indeed, it would seem absurd to allow the fact that van de Beek's alleged conduct occurred during an examination conducted for work-related reasons (rather than in one of the many non-work-related situations in which a physician who was a state actor might examine a patient) to alter the controlling standard.

Van de Beek's second proposed question is: "When a Title VII claim is dismissed, should the § 1983 claim of sexual harassment be dismissed as well?" His brief reveals that the assumption underlying this question is that, because I have found that Ascolese may not bring a claim against van de Beek (or, indeed, against any individual defendant) under Title VII, Ascolese should also not be permitted to bring such a claim under section 1983. He bases this claim on the assertion that section 1983 sexual harassment claims are usually interpreted in a manner consistent with the parallel Title VII claim.

■ This argument is entirely meritless. It is true that I have found that Title VII does not permit plaintiffs to bring claims against individual defendants. *See Ascolese v. SEPTA,* 902 F.Supp. 533, 541 (1995). However, the Third Circuit specifically found in *Andrews* that Title VII and section 1983 claims "are complex actions with different elements," and that the courts should be attentive to the ways in which the two types of claims are parallel and the ways in which they differ. 895 F.2d at 1483 n. 4. One of the principal purposes of section 1983 was precisely to "give a remedy to parties deprived of constitutional rights, privileges and immunities by an official's abuse of his position," *Monroe v. Pape,* 365 U.S. 167, 172, 81 S.Ct. 473, 476, 5 L.Ed.2d 492 (1961), that is, to provide a remedy against individual officials who violate constitutional rights. For van de Beek to argue that this purpose should be set aside in order to ensure consistency with Title VII verges on the frivolous.

I will therefore deny the motion to certify these two questions for immediate appeal.

## IV. *Ascolese's Sex Discrimination Claims against SEPTA and Evans*

The defendants' third set of arguments is directed at Ascolese's Title VII sex discrimination and retaliation claims against SEPTA and her section 1983 sex discrimination and retaliation claims against Evans. I will begin by considering the defendants' arguments as to Ascolese's sex discrimination claims.

### A. *Ascolese's Sex Discrimination Claims*

■ Ascolese's sex discrimination claims against SEPTA and Evans are based upon her assertion that SEPTA's (or Evans') delay in granting her request for light duty during her pregnancy was the result of intentional discrimination. In my previous opinion, I denied the defendants' motion for summary judgment as to these two claims. A key ingredient of my rationale for this decision was my finding that Ascolese had presented evidence indicating that Evans had required her to submit more detailed medical evidence in support of her light duty request than SEPTA had previously required of at least some other male employees, and that this requirement of detailed medical evidence may have been responsible for the delay in Ascolese's receipt of light duty. Ascolese's principal piece of evidence that she had been held to a higher standard of medical evidence than had male officers was deposition testimony of defendant Evans that could be read to indicate that he had granted a verbal request for light duty. The deposition testimony on which I based this conclusion was:

Q. Had there been any requests for light duty in the last year for injured off duty?

A. There were two verbal requests that I know of[.]

Q. From?

A. Eugene Williams and George Sullivan. I'm sorry there were three. The other was David Jones.

Q. Was he there?

A. Was he where?

Q. In the radio room?

A. Yes. The Sergeant in the radio room wears a uniform and is subject to being called out on the street at any time.

Q. So he had been called out on the street?

A. You asked me if he wasn't assigned, he was assigned to radio, he was off on a non duty related injury. If he were to return to radio it would have to have been a light duty status. But, we didn't give him the job.

Q. How about Eugene Williams?

A. Eugene Williams had a debilitating illness and requested we find some administrative function for him so he didn't burn up all his sick time so he could remain active.

Q. And when did he submit that request?

A. The early part of 1993. It wasn't a submitted request[,] it was a verbal request.

Plaintiff's Response to Motion for Summary Judgment, Exhibit 42. The meaning of this exchange—particularly that of the discussion of the radio room, which appears to relate to David Jones—is not at all clear. At most, however, it could have been read to indicate that Evans may have granted a verbal request from Eugene Williams for light duty. The defendants have now presented an affidavit by Evans stating that he in fact denied Williams' request. Evans Affidavit, Exhibit D to Defendants' Motion for Reconsideration. Accordingly, Williams is no longer relevant to Ascolese's claim.[11]

The defendants have therefore negated much of Ascolese's evidence that her light duty request was held to a discriminatorily high standard. Her remaining evidence to that effect is her conversation with Evans, in which Evans could be construed as having

expressed skepticism as to whether pregnancy was a disability, and the fact that her light duty request was subjected to what I called in my previous opinion "a twelve-day delay which a jury might well conclude was unnecessary." *Ascolese*, 902 F.Supp. at 542.

This evidence does not suffice to demonstrate that SEPTA's (or Evans') delay in granting Ascolese's light duty request was intentional. As I remarked in my previous opinion in this case, "misfeasances of a bureaucratic nature" can at times demonstrate intentional discrimination without other evidence, but only if those misfeasances are "intense, comprehensive, and sustained." *Ascolese*, 902 F.Supp. at 544. The twelve-day delay in granting Ascolese light duty does not fit this description. Nor does the evidence that Evans may have been skeptical as to the status of pregnancy as a disability indicate intent sufficiently strongly to make out a case of intentional discrimination. Thus, I find that the defendants' summary judgment motion should be granted as to Ascolese's Title VII disparate treatment claim against SEPTA and as to her section 1983 sex discrimination claim against Evans.

### B. *Ascolese's Retaliation Claim*

My previous opinion also denied the defendants' motion for summary judgment as to Ascolese's Title VII retaliation claim against SEPTA and her section 1983 retaliation claim against Evans. The governing standard in the Third Circuit requires that Ascolese demonstrate (1) that she engaged in a statutorily protected activity, (2) that she suffered an adverse employment action, and (3) that a causal link exists be-

---

**11.** My previous opinion had also noted that there was some ambiguity as to what medical evidence had been required of three male SEPTA employees who had previously received light duty. The defendants have now presented evidence indicating that the medical evidence that was required of these employees was comparable in its level of detail to that required of Ascolese. (The employees' names are not necessary to this decision; therefore, I have omitted them.) One of the employees had fractured his right femur; his medical note stated "no excessive walking, standing or stair climbing, the patient should have a sedentary position." Attachment to Evans Affidavit. Another was granted light duty for psychiatric reasons; the defendants have submitted a

note from a psychiatrist stating that the employee should "avoid stress—including work assignments requiring him to carry a firearm." Attachment to Evans Affidavit. The third employee was apparently transferred to a light duty position in the radio room at the request of the radio room supervisor, so that he did not in fact have to submit a light duty request at all. Evans Deposition, Exhibit J to Defendants' Motion for Summary Judgment at 83–88. (The transfer of the third employee to a light duty position at a moment when he may have been unable to perform regular duty is unusual, but, in the absence of a pattern of such transfers, it is impossible to conclude that it was more than a coincidence.)

tween the protected activity and the employment action. *See Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3rd Cir.1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990). In my previous opinion, I found all three of these elements to be satisfied.

The defendants now renew their argument that the third element of *Jalil*'s test, its requirement of causality, is not met. I based by previous conclusion that this requirement was satisfied on the evidence that Evans was very likely aware that Ascolese had filed a complaint against van de Beek, and on Ascolese's testimony that Evans had called her a "troublemaker" immediately before she experienced delays in receiving light duty. A further necessary (if unstated) predicate of my previous decision was the fact that there was some evidence, described above, that Ascolese's light duty request had been held to a higher standard than those of other SEPTA employees (whether male or female is unimportant for our purposes here).

I have now concluded, see *supra* section III.A, that there is no evidence that Ascolese's light duty request was held to a higher standard than those of other SEPTA employees. Thus, the only remaining evidence of a causal connection between Ascolese's complaint against van de Beek and the delay in her receipt of light duty is Ascolese's assertion that Evans called her a "troublemaker" (and the likelihood that Evans knew of Ascolese's complaint against van de Beek). In the absence of any indication that Ascolese was treated differently from other SEPTA employees, the "troublemaker" comment, standing alone, does not indicate that SEPTA's delay in granting Ascolese light duty was the result of retaliation. Because there is therefore no genuine issue of material fact as to *Jalil*'s "causality" element, the defendants' motion for summary judgment will be granted as to Ascolese's Title VII and section 1983 retaliation claims.

### ORDER

For the reasons set forth in the opinion filed herewith, it is hereby ORDERED that:

1. The defendants' motion for reconsideration, which, pursuant to a previous order of this court, has been treated as a renewed motion for summary judgment, is GRANTED as to Ascolese's remaining Title VII retaliation and gender-based disparate treatment claims against SEPTA, and as to her section 1983 sex discrimination and retaliation claims against Evans.

2. The motion is DENIED as to Ascolese's section 1983 sex discrimination claim against van de Beek, and as to her section 1983 pregnancy testing claim against SEPTA.

3. SEPTA's motion for summary judgment as to van de Beek's qualified immunity is DENIED.

4. SEPTA's motion to certify questions relating to Ascolese's sex discrimination claims against van de Beek for immediate appeal is DENIED.